Sterling C. HOLLOWAY et al., Appellants,

v.

INTERNATIONAL BANKERS LIFE
INSURANCE COMPANY.

No. 16250.

Court of Civil Appeals of Texas.

Fort Worth.

Jan. 5, 1962.

Rehearing Denied Feb. 16, 1962.

Black & Stayton, and John W. Stayton, Austin, Cantey, Hanger, Johnson, Scarborough & Gooch, Sloan B. Blair and J. A. Gooch, Fort Worth, for appellant.

H. Joe Loe, Fort Worth, McGown, Godfrey, Logan & Decker, Warren W. Shipman, III, John B. McClane, Winfred Hooper, Jr., and John W. McMackin, Fort Worth, for appellee.

MASSEY, Chief Justice.

International Bankers Life Insurance Company, hereinafter called the company, brought suit against Sterling C. Holloway, D. D. Beasley, and J. W. Walden, hereinafter sometimes called the defendants, who had formerly been the officers and directors of said company. In the language from the company's third amended petition, upon which the cause proceeded to trial, it sued the defendants for "damages for conspiracy and fraud, breach of trust, usurpation of corporate rights and opportunities, exemplary or punitive damages, for the establishment of a constructive trust, and for an accounting for profits gained by improper and fraudulent stock sales, mismanagement of corporate funds, unlawful and improper profits from land transactions, and misuse and misapplication of corporate funds * * *."

The company obtained a joint and several judgment against all three of the aforenamed defendants, based upon answers returned by the jury in its verdict. From the judgment Holloway and Beasley perfected an appeal. Walden did not appeal.

Judgment affirmed in part, and in part reversed and rendered as applied to parties bringing the appeal.

A review of the allegations in the company's petition discloses that it was declared that during the months of September, October and November of 1952 (and in the alternative at a later date in subsequent years), a conspiracy was created in that the defendants together conspired, as delineated in considerable detail, by the promotion and creation of an insurance company which they were to control, and thereby to unlawfully personally profit: (1) by receiving commissions on the sales of stock in said corporation for their personal benefit; (2) by so manipulating its affairs as to derive profits from land to be acquired by the corporation; and (3) by acquiring large blocks of personal stock which they would sell to the public in competition with a stock sale whereby new issue company stock was supposed to have been sold to the public, substituting their own personal stock for stock in the company which should have gone to the public, the proceeds from such sales of stock to go into the pockets of the defendants rather than into the treasury of the company.

Further allegations included averments that the defendants intentionally and wilfully prevented the qualification of the new issue company stock with the Texas Securities Commission, as required by an amendment of the Texas Securities Act of 1955 (Vernon's Ann.Civ.Tex.St., Title 19, "Blue Sky Law—Securities", Arts. 581–1 to 582–1) a material provision of which became effective September 6, 1955, and which amendment required that in order for the company to issue and market its stock the amount for which the stock could be sold must have the approval of the Commissioner of Securities,—by instructing the company attorney not to qualify the stock as the law required if it were to be lawfully sold to the public,— as result of which the stock was unsalable. It was also alleged that in furtherance of the conspiracy the defendants caused to be issued to one Carl Werner the company's check in the amount of $5,000.00, designated as an "advance against commissions" to be earned by Werner from the sale of new issue company stock, and thereafter caused the company to "charge off as uncollectible" the amount so advanced, although in the interim Werner did receive many thousands of dollars as commissions for the sale of company stock, as to which defendants fraudulently failed to apply as credit thereupon the $5,000.00 so advanced.

In the alternative to their demands for damages, plus exemplary damages, because of the actions of the defendants,—the company prayed that the defendants be made to account for all profits realized by them as result of their breach of fiduciary duty, and as a result of their usurpation of the opportunity of the company to sell its company stock, and also for all profits derived from the other fraudulent, unlawful and improper conduct and dealings of defendants in the money and assets of the company. The company further, and under the same alternative, sought judgment of the court declaring that the defendants were trustees *ex maleficio* of all funds improperly and illegally appropriated by them rightfully belonging to the company, and of all funds received by them from sales of their personal stock in competition with the company stock sale, and in appropriation of the rights and opportunities of the company,—and that upon the imposition of such constructve trust the defendants be compelled to pay all amounts of money found to be within the purview of said constructive trust relationship. In said connection the company expressly offered to do equity, under such terms and conditions as the court might direct.

By verdict returned the jury found that the defendants "entered into a combination by their concerted action to realize a profit to themselves" (1) by receiving commissions on the sales of stock in plaintiff company for their personal benefit, (2) by so manipulating the affairs of the company as to derive profits from a transaction by which land was acquired by the company, and (3) by acquiring large blocks of personal stock which they sold to the public in competition with a stock sale whereby new issue company stock was supposed to have been sold to the public, substituting their own personal stock for company stock which should have gone to the public, and pocketing the proceeds. The amount of profit realized by all the defendants as to each action of malfeasance was established in the verdict.

Additionally, in respect to each act of the defendants so found, the jury further found that in realizing the profits so made by them the defendants acted "with malice" (defined as "ill will, bad or evil motive, or such gross indifference to the rights of others as will amount to a willful or wanton act"), whereby the company was found to be entitled to exemplary damages in an amount specified.

By other answers returned the jury found that the defendants converted the sum of $559.62 belonging to the company, by way of two checks, one for $83.00 and the other for $476.62, in March of 1955; and in so converting said sum the defendants acted with malice; and that by reason of such the company was entitled to exemplary damages, found further in the sum of $1,119.24. Under our construction of the pleadings and evidence this amount "converted", $559.62, was "commissions" unlawfully received on the sale of the company stock. As such the $559.62 is to be added to the amount of profits elsewhere found in connection with the receipt of such commissions.

By other answers returned the jury found that the defendants intentionally and wilfully prevented the qualification of the company stock with the State of Texas so that it could be sold after September 6, 1955; that if said stock had been qualified it could have been sold; that the defendants entered into a combination by their concerted action to sell their personal stock during the period September 6, 1955, to December 15, 1956, when the company stock could have been sold if qualified; that the defendants did sell their personal stock during said period realizing profits totaling the sum of $30,075.00 by so doing; that the defendants in so selling their personal stock during said period acted with malice; and that by reason thereof the company was entitled to exemplary damages, found further in the sum of $30,075.00.

By other answers returned the jury found that the defendants "entered into a

combination by their concerted action" to advance to C. Carl Werner $5,000.00 as evidenced by check dated March 14, 1955, with the intention that such sum would not be repaid to the company; that the $5,000.-00, as evidenced by said check, was advanced to Werner; that in making said $5,000.00 advance the defendants acted with malice; and that by reason thereof the company was entitled to exemplary damages, found further in the sum of $10,-000.00.

By other answers returned the jury found that the company's directors did not, either in a Directors' Meeting or in an Executive Committee Meeting, discover prior to December 15, 1956, the various actions complained of on the part of the defendants. These were by way of special issues submitted to the jury upon the defendants' pleas of limitation. In respect thereto the court in its judgment made the further finding that the company did not have notice prior to December 15, 1956, either actual or constructive, of any of the matters complained of by it in its pleadings, by reason of any notice to Thomas L. White, brother-in-law of defendant Walden, to Audine Jones, stenographer of defendant Walden, or to C. B. Walden, brother of the defendant Walden, for the reason, among others, that in any event, notice to these persons would not have been notice to the company. In this connection the court stated that since any such notice shown in their testimony in deposition, which is a part of the record in the cause, was not submitted to the Board of Directors or Executive Committee of the company, and said persons were, by reason of their relationship to the defendants, adversely interested to the best interest of the company in the matters as to which it complained, it would not amount to notice to the company which would start the running of a period of limitation.

· █ Judgment entered was based upon the verdict of the jury, plus the further findings of the court noted above with reference to the absence of notice to the company through the parties named. The judgment was joint and several against all three defendants, and under our analysis was for profits realized in breach of trust in the amount of $228,979.70, plus $339,-714.24 "punitive or exemplary damages". As will hereinafter be discussed we have arrived at the conclusion that punitive damages were erroneously allowed. As applied to the profits realized by the defendants we take notice of the fact that $15,-000.00 was received as the result of a real estate transaction relative to property known as the Jennings property, $9,820.20 was obtained as the result of receiving unlawful commissions on the sale of the company's stock, and $169,084.50 was received as the result of sales of the defendants' personally owned stock in competition with the sale of "company issue" stock. This amounts to a total of $193,904.-70, plus interest calculated on different portions thereof from varying dates. In said respect we have determined that the findings of the jury were supported by competent and adequate evidence, and were not against the greater weight and preponderance of the evidence, and that the judgment should be affirmed.

We have determined that as applied to $30,075.00 in profits realized by the defendants from the sales of their personal stock during the period September 6, 1955, to December 15, 1956 (during which period the company's stock was not salable by reason of its not having been qualified for sale under the amendment to the Texas Securities Act effective September 6, 1955),—and as applied to $5,000.00 advanced to C. Carl Werner on March 14, 1955, and not repaid but instead "charged off" as a bad debt owing the company,— the judgment should be reversed and rendered. It is to be noticed that the case as tried and submitted was upon the theory of a conspiracy in which all three defendants participated, that the special issues were submitted in conformity therewith, and that the company has not brought before

us any cross-assignment of error. Our labor is therefore somewhat less complicated.

■ The theory upon which the company's basic cause or causes of action against the defendants were tried was to establish a conspiracy of the three defendants to act in breach of one or more of their several fiduciary and trust duties to the company, coupled with subsequent action by them in accomplishment of such breach, whereby they realized profits for the payment of which they were jointly and severally liable to the company in restitution. The applicable law is well stated in Restatement of the Law of Trusts, Ch. 7, p. 553, "Administration of Trust", sec. 205 "Liability in Case of Breach of Trust", as follows: "If the trustee commits a breach of trust, he is chargeable with * * * (b) any profit made by him through the breach of trust". The three defendants tried their case upon a general denial of the allegations of the company, plus an affirmative defense of limitations because of the company's delay in filing its suit.

The facts, or factual conclusions, established in the verdict of the jury and in the evidence of record, were wholly in conformity with the company's theory of defendants' liability, and against the latter on their pleas of limitation.

In entering upon consideration of the issues presented by the appeal of the defendants it will be well to consider the generally applicable pertinent principles of persons in positions of authority in the corporate structure of corporations. 13 Am.Jur., "Corporations", Part XVII, "Directors, Officers, and Agents", sub. F, "Rights, Duties, and Liabilities as to Corporation or Stockholders", under sub. 1, "Duties and Liabilities to Corporation or Stockholders", deals with duties and liabilities involved in management beginning at sec. 985, "Generally", p. 939. Therein it is stated that the directors and officers of a corporation in charge of its management are, in the performance of their official duties, under obligations of trust and confidence to the corporation or its stockholders and must act in good faith and for the interests thereof, with due care and diligence and within the scope of their authority. Any intentional deviation or departure from these duties to the substantial injury of any of the stockholders constitutes wilful mismanagement as a matter of law, for which a court of equity has jurisdiction to call them to account. The directors are liable for any breach of their duty with respect to the capital and assets of the corporation.

A section following, sec. 994, "Joint and Several Liability for Mismanagement and Misconduct", says that where two or more officers join or participate in a wrongful act to the detriment of a corporation they will be held jointly and severally liable, under general rules, although directors are not liable for the wrongful acts of co-directors if they do not connive with them and if ordinary care on their part would not have averted a resulting loss. See also 90 C.J.S. "Trusts" § 258, "—Cotrustees", sub. b, "Liabilities", pp. 296–298.

Further continuing in American Jurisprudence we find in sec. 996, "(Directors') Right to Rely on Statements by Persons in Immediate Charge of Business", it is stated that in the absence of circumstances calculated to put directors upon inquiry they are ordinarily entitled to rely upon statements made to them by competent persons who are in immediate charge of the corporation's business, although if facts appear which would arouse the suspicions of an ordinarily prudent business man, the directors may be held negligent if they fail to exercise proper care in making inquiries before placing reliance thereupon.

Under "Fiduciary Duties and Liabilities", sec. 997, "Generally; Fiduciary Relationship", it is stated that in a broad sense the directors and officers of a corporation are its agents. While not trustees in the strict sense they occupy a fiduciary, or more exactly a quasi-fiduciary, relation to the cor-

poration and its stockholders. Those in position of management are required to act in the utmost good faith, giving to the enterprise the benefit of their care and best judgment and exercising the powers conferred solely in the interest of the corporation or the stockholders as a body or corporate entity, and not for their own personal interests. As to the corporation itself, equity holds them liable as trustees. Indeed, it is the view frequently and broadly taken that the officers and directors of a corporation are, at least in substance and in many respects, trustees for the corporation or its stockholders.

In sec. 998, "Personal Profit or Advantage from Office", it is stated that a director or an officer of a corporation will not be permitted to make a private profit out of his official position; he must give to the corporation the benefit of any advantage which he has thereby obtained. Secret profits must be accounted for. Officers and directors, while occupying such fiduciary relation, are precluded from receiving any personal advantage without the fullest disclosure to, and assent of, all concerned. The directors of a corporation cannot obtain a profit from their office by appropriating to themselves at a price less than its enhanced selling value stock of the corporation which has not been subscribed for and as to which appropriation the other stockholders have no notice; and if they do make such an appropriation, the profits accruing to them from the transaction constitute a trust fund belonging to the stockholders. If the directors of a corporation secretly combine with strangers to defraud the company and make a secret profit for themselves by selling to it certain lands and property, the corporation need not, on discovery of the fraud, disaffirm the transaction, but may sue for the secret profits without making a tender of a reconveyance of the lands and property conveyed. See also Milan v. Cooper Co., 1953 (Tex.Civ. App., Waco), 258 S.W.2d 953, writ ref., n. r. e.; Dunagan v. Bushey, 1953, 152 Tex. 630, 263 S.W.2d 148; Scott on Trusts (Second Ed.), p. 1522 et seq., "The Administration of the Trust", sec. 205, "Liability in case of breach of trust".

Continuing under the article in American Jurisprudence, we note in sec. 1001, "Presumptions and Burden of Proof", the statement that in some jurisdictions, those who would support transactions between corporations having directors or officers in common must show their fairness, and that there is authority to the effect that such transactions, unless expressly authorized or ratified by the stockholders, are presumed to be fraudulent. Among the annotations under this statement is the case of Corsicana National Bank v. Johnson, 1919, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141.

Under sec. 1002, "(Dealing with Corporation Where Interests are Adverse)—General Rule", it is stated that the general rule of agency which prohibits an agent from representing both himself and his principal in a transaction in which their interests are adverse applies where a corporate officer or director attempts to represent both himself as an individual and a corporation in a transaction in which his and the corporate interests are adverse and antagonistic. Although in this kind of a transaction the contractors may, as members of the corporate board, have acted honestly and solely with reference to the corporate interest, yet they occupy a position which puts it in their power to conceal the evidence of the facts and so to defy detection if they had acted otherwise. Therefore, to hold such contracts valid until shown to be fraudulent or corrupt would, as a general rule, enforce the contracts in spite of fraud or corruption tainting them.

In connection with examples considered under sec. 1003, "Application of Rule", we find statements as follows: "A director cannot, according to the better view, form part of a quorum to act on a proposition in which his individual interest is adverse to the corporation although he does not vote upon the matter." "Directors cannot lawfully enter into a contract in the benefit of

which even one of their number participates without the knowledge and consent of the stockholders." "The rule prohibiting a director or other corporate officer from representing both himself and the corporation where their interests are adverse precludes one from contracting with the corporation where the corporation is represented by dummy directors who are under his control." "One of the most familiar devices resorted to by directors for the purpose of furthering their own interests to the detriment of the corporation is that of forming another corporation for the purpose of entering into advantageous contracts or transactions with the principal corporation; the courts do not hesitate to denounce such contracts and transactions when brought before them." A broad generalization of the rule for ignoring the concept of corporate entity is made in Continental Supply Co. v. Forrest E. Gilmore Co., 1932 (Tex.Civ. App., Amarillo), 55 S.W.2d 622, 628, writ dism. See also Bush v. Gaffney, 1935 (Tex. Civ.App., San Antonio), 84 S.W.2d 759; 14 Tex.Jur.2d p. 131, "Corporations", sec. 12, "When fiction disregarded".

■ The company, i. e., the International Bankers Life Insurance Company, is undoubtedly the concern properly deemed the "principal" corporation. In addition, and of importance in the case, was another concern, the Fort Worth Corporation. During the latter part of 1953, the Forth Worth Corporation was one in which defendants Holloway and Beasley owned 119 of the total 120 shares into which it was apportioned as to ownership. The "principal" corporation, the plaintiff company, alleged and contended at all times that the Fort Worth Corporation was the alter ego of Holloway and Beasley, employed by them for their own purposes, and activities of which were carried on by them personally and for their own private benefit. The evidence warranted the obvious conclusion by the jury that such was fact. The evidence established that as of the first part of the month of January, 1954, the capital of the Fort Worth Corporation was only $9,000.00.

The existence of the plaintiff company was first conceived in the mind of the defendant Walden. On or before September 29, 1952, he visualized the formation of such company, as a corporation, by a promotional scheme to be profitable to himself and certain friends who would be in on the "ground floor" of the organization, but costly to all others subsequently entering into co-ownership with them as additional stockholders. Walden's objective and purpose was set out in a letter written to a friend on the aforesaid date, as follows:

"Dear Don: Continue to write as much business as you can, but don't process any applications until around the 15th. I hope by that time we will have our new company started.

"Since I have really gotten into this company idea, I think we can promote a capital stock company and all come out with a nice piece of change. On the capital stock company the plans are to buy a 5-story hotel that was built in May 1948 and use that building as a vehicle to promote our company by selling additional stock at a much higher price than what we will pay for our stock. We can get this building for $410,000 and after the building is in our name I can get it appraised for $525,000. We will pay $25,000 down which will leave a note of $385,000. The difference between $385,000 and $525,000 is $140,000 which would be our equity in the company. If we establish our common stock at a par value of $10.00 per share and preferred stock at a par value of $100 per share, and if we let the $25,000 that we pay down on the building go in as common stock that will immediately make our common stock worth approximately $56.00 per share. We arrive at that figure by taking the difference between $385,000 and the appraised value of the building which is $525,000, which theoretically leaves $140,000 that has been paid into the company. We plan to sell preferred stock to army personnel at $500 per share. That

will be sold on an allotment basis and must be paid on or before 5 years from time of sale. If common stock is desired by any of the military personnel, the selling price will be $50.00 per share.

"In the capital stock company there will be seven original investors. They are you for 2000 shares of common stock, Cork for 1500 shares common stock, Cody Martin for 1500 shares of common stock, Ann Young for 1000 shares of common stock, Jess for 2500 shares of common stock, and I for 5000 shares of common stock, and Chuck Facer for 1500 shares of common stock. All of the above stock holders will buy their stock at $10 per share and 5 years time limit for payment. Ann and Jess will sell stock in the proposed capital stock company. We are planning to sell 4000 shares at $500 per share, making a total of $2,000,000 of capital stock and surplus that we would bring into the company. It will take Ann and Jess approximately 12 to 18 months to sell that much stock. At the end of that time we will have a financial structure of $450,000 capital stock and approximately $2,000,000 surplus. With that kind of financial structure we will start licensing in about 30 states. * * *."

From the evidence in the record it is apparent that by the time the company was organized and incorporated (December, 1952) those whom Walden contemplated would join with him in forming it had for various reasons been deleted, with Holloway and Beasley taking their places. Only one of Walden's friends joined, taking 10% of the stock of the company, with 90% held by the three defendants. Evidence of the fraud of Walden is supplied through the letter heretofore quoted, *plus* the actions on his part and in concert with Holloway and Beasley after the company was formed. The evidence of the fraud of Holloway and Beasley is supplied through proof of actions on their part in concert with Walden. The evidence is sufficient to support the broad conclusion obviously reached by the jury that all three conspired, each with knowledge and consent as to the others' acts (most of which were the concerted actions of all three defendants), in fraud of the company. As will be hereinafter discussed, there was want of evidence to support the findings of the jury concerning the defendants' wilful prevention of the qualification of the company's stock for sale after September 6, 1955, and want of evidence to support the findings that "all three" defendants fraudulently disposed of $5,000.00 of the company's funds to C. Carl Werner. We believe, however, that there was ample evidence to support the jury's findings of the three defendants' conspiracy, and wrongful conduct pursuant thereto, in receiving illegal commissions from stock sales,—in deriving profits from a transaction in purchase of real estate,—and from deriving profits from sales of personal stock in competition with the company's sale of its stock.

We will first consider the matter of the transaction in purchase of real estate. This property was generally termed the "Jennings property", and was located in an area in Fort Worth proximate to hospitals and to locations proven to have become popular with physicians, dentists, etc. for location of professional offices and clinics. The evidence in the record entitled the jury to conclude that for a period of some months prior to the time there was any transfer in the title of the Jennings property the defendant Walden, then the president of plaintiff company as well as a director, had been negotiating for its purchase for the account of the company. As of such time Walden had no official connection with the Fort Worth Corporation, heretofore mentioned, which was under the control of, and being operated by, Holloway and Beasley. In the early part of 1954, the Jennings heirs, owners of the Jennings property, agreed to sell the same for a consideration of $62,500.00. It was further agreed that $5,000.00 would be placed in escrow for the sellers of the property as "earnest money". On January 26, 1954, Beasley and Holloway each deposited $2,500.00 of their own money to

the account of the Fort Worth Corporation, making a total of $5,000.00, and which was subsequently used as the aforesaid "earnest money". A day or two later each of said defendants deposited into the same account an additional $100.00, totaling $200.00, which was obviously for "closing" etc. expenses incident to the real estate transaction. It is to be remembered that at the time this was done these two defendants were directors of the company (International Bankers) along with Walden. On January 30, 1954, the Jennings heirs entered into a contract to sell the Jennings property to C. W. Trigg. Trigg was purportedly acting by and through the defendant Holloway. The $5,000.00 earnest money was deposited with the escrow agent by Holloway in the form of a check of the Fort Worth Corporation, acting by and through Holloway. It is of interest to note that C. W. Trigg knew nothing of the transaction other than that Holloway, his personal friend, desired to and obtained his permission to use his name as purported purchaser in a real estate trade in order that the sellers would not know the identity of the true buyer.

A sale and transfer of the Jennings property was consummated under the contract, the Fort Worth Corporation taking title from the Jennings heirs, and delivering consideration in the form of funds borrowed from a bank, plus funds purportedly paid or deposited to the account of the Fort Worth Corporation as "part payment on building" by the International Bankers. Disregarding the closing costs etc., the total expense and cost of purchase from the Jennings heirs was $62,500.00. Immediately thereafter, the Fort Worth Corporation, acting through the defendant Holloway, deeded the same property to the plaintiff company for a consideration of $77,500.00. It is of interest to note that the later deed recited on its face a consideration of "ten dollars and other good and valuable consideration", while the deed to the Fort Worth Corporation recited the true consideration of $62,500.00, with the Federal Revenue stamps on each of the deeds amounting to the identical figure of $68.75.

Obviously there was a $15,000.00 profit in the aforesaid transaction. Promptly after its consummation, by checks issued to Holloway and Beasley by the Fort Worth Corporation, the loans of each to said corporation in the amounts of $2,600.00, plus $5,000.00 profit (for each), were paid to them. Walden had to wait a month, but likewise received his $5,000.00 in the form of a check from the Fort Worth Corporation labeled "Comm. on real estate and stock transfers". The amounts so received amounted to profits realized from a constructive fraud perpetrated upon the company, for which it was entitled to redress. The plaintiff company, of course, received only a deed to the property. It is true that said property, or at least a subsequent use thereof in a "prospectus" in connection with stock sales thereafter following, was helpful to the company. It was the proposed site for a physicians' building with attached parking garage, for the accomplishment of construction of which capital was sought to be raised through subsequent sales of the company's stock.

Before the time of the aforesaid transaction, during 1953 and afterward, the company stock was being sold by stock salesmen and brokers. Beginning in 1953 the company authorized the issuance of 10,000 shares of stock to be sold at $20.00 per share. It is observable that at such a price per share 10,000 shares would be $200,000.00. It would be less, of course, as to sales less commissions (not to exceed 20%), and if all 10,000 shares were sold and commission of 20% paid the amount would be $160,000.00. In addition to the shares already owned by the three defendants, they took additional shares from the 10,000 issue as follows: Walden 780 shares, Beasley 78 shares, and Holloway 146 shares. It is of interest to note that as to the stock taken by the three defendants the company received only $16.00 per share instead of the $20.00 per share that should have been paid and received. By buying the stock at such

figure, thus saving $4.00 per share, defendants saved a total of $3,890.00 which the company should have received in view of the fact that no commission was paid on the purchase. No part of the company's judgment is predicated upon this, however, and the proof thereof would be of value only in respect to its weight in connection with issues submitted to the jury upon other aspects.

There was evidence, however, that in connection with commissions for the sale of the aforesaid stock by agents selling the same, and in particular by one Jess Walden brother of the defendant Walden, a portion thereof was delivered or rebated to the Fort Worth Corporation, and that of such portion the corporation in due time delivered all but a very small amount directly to the three defendants,—although not in equal amounts for the defendant Walden received only about one-half of the amounts received by Holloway and Beasley. The same thing was true as to additional payments made direct to the Fort Worth Corporation by the plaintiff company after Jess Walden's stock sales connection was severed. Obviously the whole amount payable for the stock was not paid prior to such time of severance, but for which the delivery of the portions of the commissions would no doubt have been handled as they were before it occurred. Further, an additional sum of $559.62 (made up of two checks, $83.00 and $476.62) was not even deposited into the account of the Fort Worth Corporation, but deposited by the defendant Holloway into his "Sterling Holloway, Agent" account. The evidence in the record, in our opinion, establishes that the amount so deposited was a part of the whole of the portion of the commissions from the $20.00 stock sale which went to the three defendants, a greater part thereof being "channeled" through the Fort Worth Corporation. In the company's pleadings it is noted that its allegations were to the effect that said $559.62 were "commissions", or a portion thereof.

Pointing out the fact that at all material times the three defendants were receiving part of the commissions on the stock sales the company cites V.A.T.S., Art. 3.67 under the Insurance Code. Chapter 3, "Life, Health and Accident Insurance", Art. 3.67 "Director Not to Do Certain Things", reads in part, as follows: "No director or officer of any insurance company transacting business in or organized under the laws of this State, shall receive any money or valuable thing for negotiating, procuring, recommending or aiding in any purchase or sale by such company of any property, * * * nor be pecuniarily interested, * * * in any such purchase, sale or loan." In view of the nature of the relief sought by the suit, the company of necessity relies upon the malfeasance in breach of trust to it as the fiduciary of the three defendants, to the profit of the latter, and utilizes the additional proof that the acts were in violation of the statute law in an emphasis of the degree of malfeasance. The corporate veil of the Fort Worth Corporation (in connection with such transaction) was properly pierced, and the fiction of its entity as a corporation properly disregarded the same as in the case of the $15,000.00 which found its way through said corporation and into the pockets of the defendants on the Jennings property (real estate) transactions.

Immediately after closing out the $20.00 offering (on the 10,000 shares of stock), the defendants held a closed pre-emptive offering doubling the amount of stock outstanding to 25,000 shares. This 12,500 share offering was to be paid for at $10.00 per share, cash, in 30 days. A great many of the sales of the $20.00 stock which had been "closed out" immediately prior thereto had been bought by military personnel on the installment plan, installment payments thereon being made at the very time of the pre-emptive offering. Obviously these stockholders, or at least the greater part thereof, were not in a position to take the new offer of stock and pay cash for it in

thirty days. Certainly they could take very little, if any. The three defendants personally subscribed to purchase more than the entire 12,500 share issue and actually bought 5,589 shares, not taken by the other stockholders, at the $10.00 per share price.

Immediately after the closing out of this $10.00 issue the three defendants, maintaining their complete unfettered control over the company, "split" the existing shares of stock on a "ten for one ratio", simultaneously setting up a new issue of 100,000 shares of company stock purportedly to be sold to the public by the company at a price of $10.00 per share. This maneuver resulted in the three defendants owning 88,880 shares of stock, which had cost them slightly over one dollar per share. If their stock had been worth $10.00 per share, its value would have amounted to $888,800.00.

In connection with the prospective sales of the new issue of 100,000 shares of company stock, the company, principally through action taken by the three defendants, caused to be prepared elaborate prospectus folders in which it was stated that the proceeds from the sale of the aforesaid company's issue of the stock would "be used to construct an ultra-modern aluminum and glass medical office building" on the Jennings property heretofore mentioned. Reprints of a local newspaper publicity release of eight months earlier were made up for sales and publicity purposes.

Further, in connection with the prospective sales of the new issue of 100,000 shares of company stock, arrangements were made with stock salesmen and stockbrokers to sell the same. The defendants made arrangements with the same stock salesmen and stockbrokers to sell their personal stock. As an inducement for the sale of their personal stock the defendants offered to pay a higher commission on the sales price for sales of their person-

al stock than the law allowed to be paid for the sales of the company issue. It may be readily understood why the sales persons, in the period April 1, 1955, to May 30, 1955, sold 16,951 shares of the defendants' personal stock as compared with 2,136 shares of the new issue of company stock, the commission to be realized "per share sold" being greater than would have been the case had the company stock been sold. Furthermore, there was evidence in the record of additional inducements offered certain of those persons selling or managing the sale of stock to sell the defendants' personal stock rather than the company's.

The evidence in the record relating to the sales of personal stock in competition with the sales of the company's new issue of stock is elaborate and exhaustive, obviously going into circumstances demonstrating the degree of the defendants' malfeasance as of contemplated importance for the jury in connection with the matter of its consideration of an issue on exemplary damages to be assessed. Since elsewhere herein we hold that such damages were improper under the manner in which the special issues were submitted to the jury, and by reason of the theory of recovery to which the company should be confined in view of the nature of the proof as to the defendants' profits, we find it unnecessary to go further into such evidence other than to note that the defendants remained in complete control of the company throughout the period of the personal stock sales. Immediately after the stockholders' meeting at which the resolution was passed for the "ten for one stock-split", at which all the defendants were personally present and voting, a directors' meeting was held, at which the defendants were also present, pursuant to which Beasley was elected Chairman and Walden and Beasley were appointed as the sole members of the Executive Committee of the Board of Directors, with all of the powers of the full Board. Such condition of authority continued, with minor and immaterial varia-

tions, for the full period of time with which we are concerned.

■ The evidence was full and complete relating to the facts of the defendants' breach of trust to the company in connection with the sales of their personal stock in competition with the sales of the company's stock, and in relation to the profits thereby realized by them, and the jury's findings in respect thereof have adequate support. Specifically, we hold that directors of corporations may not knowingly "unload" their personal stock so as to injure the corporations by rendering them unable to wage successful campaigns to sell their own new issue stock, and that to do so amounts to constructive fraud. Particularly is this so when directors scheme in advance to competitively dispose of their personal stock.

On the matter of profits realized by defendants from the sale of personal stock during the period September 6, 1955, to December 15, 1956

V.A.T.S., Title 19, "Blue Sky Law—Securities", Arts. 581–1 to 582–1, was amended in 1955. See General and Special Laws of Texas, 54th Legislature, Regular Session, 1955, ch. 67, p. 322, and ch. 384, p. 1002. By such amendment the former Securities Act (Art. 579) and the Insurance Securities Act (Art. 580) were repealed. As amended the Act related to both corporate and insurance securities. Art. 581–7 "Permit or Registration for Issue by Commissioner; Information for Issuance of Permit or Registration", sub. A, "Qualification of Securities", provided that no dealer, agent or salesman should sell or offer for sale any securities issued after September 6, 1955, except those which shall have been registered by Notification under pertinent subdivisions of the Act. By such registration it was made necessary, under the Act, that the issuing corporation or concern be authorized to issue such securities, and which would include stock of insurance companies, as a predicate to regis-

tration thereof. By Art. 581–10, "Examination of Application; Permit", sub. A, "Commissioner to Examine Application; Grant or Deny", it was provided that upon the filing of an application for qualifying securities the Securities Commissioner should make certain investigation and findings as a predicate to his duty to issue to the applicant a permit authorizing it to issue and dispose of securities. Among the "findings" to be made as a predicate to issuance of the permit is that "any consideration paid, or to be paid, for such securities by promoters is fair, just and equitable when such consideration for such securities is less than the proposed offering price to the public, and that the securities which it proposes to issue * * * are not such as will work a fraud upon the purchaser thereof, * * *." Essentially, and as applied to the questions of the instant case, the Securities Commissioner is to determine the maximum consideration to be paid for the securities desired to be issued and sold. It follows that the Commissioner would either suggest a price which he would deem fair or would, in the alternative, continue to insist that the applicant suggest "proposed" prices until reduced to a figure he considered fair.

As the material date of September 6, 1955, drew near the company took action directed toward an objective of obtaining a "qualification" of company stock which it desired to sell. Its stock had been selling for approximately $10.00 per share. The company's application for qualifying securities it desired to sell was not submitted to the Securities Board until late in the year of 1955. In connection with the proposals of the company it was requested that the proposed offering price of its stock be approved for $12.50 per share. The Securities Commissioner, without setting an exact figure, caused it to be made plain to the company that its condition and situation was such that the stock could be approved for sale only if the consideration for which the company proposed to sell it be reduced to something between $6.00 and

$7.00 per share. In other words, it came to the knowledge of the company that in order to qualify stock the company might desire to issue and place on the market for sale it would have to be offered at a price approximating $6.50 per share. It is clearly apparent that had the stock been qualified for sale at the reduced figure and placed on the market for sale the stockholders who had purchased their stock within less than a year at a price around $10.00 per share would have felt outraged. It is entirely possible that one or more of them might have been stirred from lethargy into action which would have caused an investigation into the antecedent history of operations earlier than such investigation was actually initiated.

Nevertheless, we are of the opinion that the evidence in the record shows no more than that the decision was made by the defendants, along with others directing the company, that it would be unwise to issue new company stock at the reduced figure, and that, temporarily at least, the application to qualify additional stock be withdrawn. Its withdrawal was requested and it was returned in March of 1956.

In this expression of opinion, which carries with it the legal holding that there was no evidence supporting the submission of the special issue, and answer thereof by the jury finding that the defendants intentionally and wilfully prevented the qualification of the stock for sale, we take full notice of the fact that there was adequate evidence warranting jury findings that the defendants did act in furtherance of a conspiracy to breach trust obligations in fraud of the company and its stockholders in receiving unlawful commissions from stock sales, in negotiating real estate transactions so as to reap a profit to the detriment of the company, and in selling personal stock in improper competition with the sale of company stock. That proof concerning such might have bearing upon impropriety of the failure to qualify the company stock for sale after September 6, 1955, but it does not in and of itself constitute evidence that the

defendants wilfully and intentionally prevented the qualification of the stock for sale. There must be more and connecting evidence than appears in the record if there is to be legal force and effect given the jury's answer to the issue.

There is evidence that the defendants, conspiratorially perhaps, proceeded to sell their personal stock after September 6, 1955, and up to December 15, 1956. During this period the company had no stock to sell, none having been qualified for sale by the Securities Commissioner. Under the circumstances of the case this is perhaps unfortunate for the company, for it eliminated the very ground upon which the jury found, as it was fully warranted in doing, that the defendants' sales of their personal stock up until that time, in competition with the company's stock, enabled them to earn profits upon which equity would seize for the benefit of the company. The very basis for equitable restitution for all profits made by the defendants through their sales of personal stock prior to September 6, 1955, was destroyed by the operation of the statute after that date. In order for the company to reach into the defendants' profits after September 6, 1955, it would be absolutely essential that the evidence warrant the finding that the company was wrongfully prevented from qualifying its stock for sale after that date, and we have held that the proof of record does not amount to evidence that such was the case.

On the matter of the $5,000.00 advance to Werner and subsequent "charge off" of the debt

We have concluded that the jury's finding that the *three defendants* "entered into a combination by their concerted action to advance to C. Carl Werner $5,000, as evidenced by check dated March 14, 1955, with the intention that such sum would not be repaid to Plaintiff" is not supported by any evidence. Neither is there any evidence that the *three defendants* advanced "to C. Carl Werner $5,000, as evidenced by check dated March 14, 1955, with the intention

that such sum would not be repaid to Plaintiff."

There is considerable evidence in the record relative to wrongful actions of all the defendants in disposing of their personal stock in competition with the sale of the company stock, in connection with which Werner played a material part. Nowhere, however, is there any evidence tending to establish that the defendant Holloway was represented by either of the other two defendants, or by any other person, in either the advancement of the $5,000.00 to Werner in March of 1955, or its "charge off" by the company in December of the same year. The uncontradicted evidence in the record is to the effect that Holloway knew nothing of the "advance" or of the "charge off".

There was evidence which would have warranted the jury in a conclusion that the defendants Walden and Beasley wrongfully and concertedly acted to the detriment of the company in connection with the matter inquired about in the special issues relative to the $5,000.00 transaction with Werner. It was not their action alone as to which the special issue inquired, but the inquiry was predicated upon the company's theory that the conspiracy of all three defendants, "in combination by their concerted action", extended to and incorporated the transaction with Werner whereby he was given the $5,000.00 and then in behalf of but against the interests of the company, forgiven his indebtedness therefor. As to this the want of evidence follows for the absence of any proof connecting Holloway therewith.

On the matter of exemplary damages

As heretofore indicated we have reached the conclusion that the company was not entitled to the judgment it obtained in so far as said judgment awarded exemplary damages.

In each instance the jury's award of exemplary damages was based upon the jury's answer finding the amount of the defendants' profits from a breach of trust in a material respect. Each time the jury found that the defendants, in so profiting from the breach, acted with malice (i. e., ill will, bad or evil motive, or such gross indifference as amounted to a wilful or wanton act) whereby the company was entitled to exemplary damages in an amount thereafter fixed in answer to a special issue.

■ In view of the fact that we do not consider the jury findings setting the amount of "profits" (from the breaches of trust by the defendants) to be synonymous with "damages" sustained by the company, we have reached the conclusion that exemplary damages were erroneously founded thereupon. In Texas, exemplary damages are allowable only in the event there is also a recovery of actual damages, establishment of even nominal damages being insufficient foundation for an award of exemplary damages. 17 Tex.Jur.2d, p. 243, "Damages", sec. 177, "Actual loss or injury as prerequisite to award"; Fort Worth Elevators Co. v. Russell, 1934, 123 Tex. 128, 70 S.W.2d 397.

■ Although we are satisfied that the evidence in the case does establish the fact that the company did sustain actual damages as the result of various of the acts in breach of trust found by the jury to have been committed by the defendants nevertheless there is complete absence of evidence upon the amount of damages thereby sustained by the company. Even had there been such evidence the court did not submit a special issue upon the amount of damages the company sustained. All the evidence bore upon the profits the defendants made, and the special issues in each instance posed inquiry as to "profits" of the defendants rather than as to "damages" or "losses" of the company. That such is true, even as to the $559.62 found by the jury to have been converted by the defendants, becomes obvious where by adverting to the pleadings it is to be observed that the company claimed said amount to have

been a part of the "commissions" illegally collected.

We recognize that the circumstances of the case were such that it was rendered difficult if not impossible to establish actual damages. We have been cited to no instance and know of none in which a similar award of exemplary damages has been considered by an appellate court of this state. We have therefore been obliged to proceed through the process of legal reasoning in our search for the correct answer.

Basically, we believe that the theory upon which the company tried its case and had it submitted to the jury amounted to an election to proceed in quasi-contract for a specific performance rather than to proceed in tort for damages. One is reminded of the outmoded term, "waive the tort and sue in assumpsit." See 13 Tex.Jur.2d p. 118, "Contracts", sec. 6, "Contracts implied in law; Quasi contracts"; 6 Tex.Jur.2d, p. 554, "Assumpsit", sec. 8, "Waiver of tort and suit on assumpsit".

■ Certainly, where trustee defendants are consciously tortious in acquiring their profits by breaches of trust, it is proper that they be deprived thereof although their *cestui que trust* has the remedy of obtaining restitution by way of damages as an alternative, or perhaps even in addition, to his rights to said profits. In any event, such a beneficiary can choose the remedy which seems most advantageous to him, and he may elect to deprive the trustees of the profit they gained rather than to obtain restitution of damages he has sustained. See Restatement of the Law of Restitution, Ch. 8, "Actions for Restitution", Topic 2, "Measure of Recovery", the Introductory note on pages 595–6.

In Restatement of the Law of Torts, p. 432, "Types of Tortious Conduct", sec. 874, "Violation of Fiduciary Duty", it is stated that a fiduciary who commits a breach of duty as such is guilty of tortious conduct to the person for whom he should act and that his beneficiary is entitled to tort damages for harm caused by the breach of duty. It is further stated, however, that "In addition to or in substitution for these damages the beneficiary may be entitled to quasi-contractual recovery, since not only is he entitled to recover for any harm done to his legally protected interests by the wrongful conduct of the fiduciary, but ordinarily he is entitled to profits which result to the fiduciary from his breach of duty, and to be the beneficiary of a constructive trust in such profits."

26 Tex.Jur.2d, p. 22, "Fraud and Deceit", sec. 80, "Equitable Remedies", states: "Courts of equity may force on the conscience of a party the duty of a trustee in regard to property that has been acquired by artifice or fraud where * * * it would be against equity to permit him to hold it except as trustee. Trusts of this character are created by a desire of equity to enforce honesty and fair dealing and are denominated trusts 'ex maleficio'." See the cited case of Miller v. Himebaugh, 1913 (Tex.Civ.App., Amarillo), 153 S.W. 338, 342, error refused.

Restatement of the Law of Trusts, Ch. 7, p. 553, "Administration of Trust", sec. 205, "Liability in Case of Breach of Trust", states the applicable law as follows: "If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust."

■ Despite the language to be found in cases and text authorities indicating that "damages" mean not only compensation, satisfaction, etc., but also "what is just to compel defendant to pay", "pecuniary consequences that the law imposes" on a defendant, etc.,—see 25 C.J.S. Damages § 71, "(Measure and Amount, 1. In General) General Rule", p. 561; 17 Tex.Jur.2d p. 80, "Damages", sec. 1, "Definitions",—we are convinced that mere proof of profits made

by a trustee through the breach of trust could not be denominated "damages" to the beneficiary. At least this is true as applied to the case before us at this time. Not being damages, the findings of the company's "exemplary damages", purportedly predicated thereupon, are without legal foundation and support and therefore should be disregarded.

· On the Issue of Limitations

None of the innocent officers or directors of the company discovered the acts of the defendants in breach of trust until 1958. In view of the time the company's suit was filed and the pleas of limitations of the defendants (Holloway and Beasley) an issue was submitted to the jury inquiring whether the company's (innocent) directors did not, either in a Directors' Meeting or in an Executive Committee Meeting, discover the various actions complained of on the part of the defendants prior to December 15, 1957. To this issue the jury returned an answer favorable to the company and destructive of the aforesaid .defendants' plea of limitations. Directors can make actual discovery only in a Board of Directors Meeting or Executive Committee Meeting. First State Bank & Trust Co. of Mineral Wells v. Davidson, 1924 (Tex.Civ.App., San Antonio), 260 S. W. 922, affirmed Frost v. First State Bank & Trust Co. of Mineral Wells, at Tex.Com. App., 276 S.W. 222; 3 Fletcher Cyclopedia Corporations, Permanent Edition (1947 Revised volume), Ch. 11 "Directors, Other Officers and Agents", pp. 70–73 under sec. 808 "(Application of general rules to particular officers, agents or other persons)— Director or directors".

The minutes of the company's meetings do not disclose any of the fraudulent acts complained of. Direct and uncontradicted testimony of the living innocent officers further support the jury finding made. Evidence in the record does show that certain isolated facts were known individually by Audine Jones, one time secretary of the company, Thomas L. White, a vice-presi-

dent, and C. B. Walden, a brother of defendant Walden. Audine Jones was shown to have been a mere stenographer whose duties never equaled those of the usual corporate executive officer occupying the position of secretary, but functioning only as a stenographer, clerk-typist and filing clerk, not participating in the formulation of corporate policy nor assuming any administrative duties. Furthermore, the evidence established that while she was technically the "secretary" she purchased company stock during the $20.00 stock issue at $16.00, no commission having been paid any sales agent therefor. It was also shown that she sold two hundred shares of her personally owned stock in competition with the sales of corporate stock at the same time the three defendants were selling their personal stock in competition with the sales of company stock. Thomas L. White, who was also a brother-in-law of the defendant Walden, testified that he knew nothing of the transaction involving the Jennings property, nor of the $20.00 stock sales, and that he knew of only one sale of stock of any kind, that one having been made by his brother-in-law Walden. He, himself, testified that he relied entirely upon his brother-in-law with respect to the business of the company.

The reason that a corporation is not charged with notice imparted to an agent whose interest is adverse to the corporation is that there is a legal presumption that an agent adversely interested will not convey such notice to his principal. Furthermore, as we have indicated, in this case at least the proper inquiry was whether the discovery of the defendants' fraudulent acts were made in a Directors' Meeting or Executive Committee Meeting.

The circumstances were not such that the issue was raised as to whether in the exercise of ordinary care the company should have discovered the fraudulent actions of the defendants at an earlier time. The defendants were in a fiduciary relationship·with the company and its innocent di-

215

rectors and officers for a portion of the material period under consideration. Such relationship is one of the circumstances to be considered in determining whether fraud might have been discovered by the exercise of reasonable diligence, and the question is quite different from one in a case where the transaction is one where the parties might be deemed to be dealing "at arms' length". Courseview, Incorporated v. Phillips Petroleum Co., 1957, 158 Tex. 397, 312 S.W. 2d 197.

There is evidence in the record of a time when the innocent directors and officers should have, were the transactions those of parties dealing "at arms' length", looked into company affairs. Had they done so at such time certain of the acts complained of might have been discovered. The occasion was when an audit report of Leatherwood and Ward, Accountants, was received by the Board of Directors. Information in the report referred to unexplained irregularities, along with general matters ordinarily treated in such reports. At the time the defendant Beasley had taken over active management of the company and in the Minutes of the Meeting it is stated that in compliance with request that he report to the Board concerning company operations, he " * * * first reviewed a preliminary audit report from Leatherwood & Ward, Accountants, Fort Worth, Texas, and following a general discussion of the information reflected by this report, Mr. Beasley recommended that no action should be taken by the Board at this time concerning the matters reflected by the audit." We can only surmise whether the irregularities mentioned in the audit were a part of Beasley's review.

Concerning somewhat similar circumstances it was held in the case of Moore v. Waco Building Ass'n, 1898, 19 Tex.Civ. App. 68, 45 S.W. 974, error refused, that when a committee was appointed to investigate the books of a company and the conduct of its business by the secretary and *de facto* general manager, and when it was

obvious that a thorough investigation would have revealed the misappropriation of company assets, yet, the committee, lulled by their confidence in the secretary, upon conducting only a cursory examination which failed to reveal the misappropriations,— did not discover the fraud and defalcation, yet the period of limitations did not begin to run and would not until *actual* discovery of the misconduct. It is stated at pages 977–978 of 45 S.W. as follows: "He was their trusted agent, charged, we may say, with the general management of their affairs, and they could assume that he would correctly continue in the performance of his duties until they received notice to the contrary. * * * we do not think that limitation would commence to run against Moore and the sureties on his bonds, on the various items set up by the plaintiff, until his shortage as to these sums was discovered; * * *."

In said connection, complaint is made by the defendants because the trial court suppressed and excluded evidence in the depositions of Audine Jones, C. B. Walden and Thomas L. White bearing upon the question of any notice to the company which would have an effect upon the issue of limitations. From what we have said it necessarily follows that the company would not have been "on notice" of the fraudulent acts of the defendants regardless of knowledge of these persons, or of any of them. Any error would have been harmless under the provisions of Texas Rules of Civil Procedure 434.

The defendants found certain points of error upon the latitude with which the trial court permitted the company's attorneys to introduce minute details concerning the transfer and sale by the defendants of their personally owned stock, and in allowing the purchasers to testify concerning the representations made to them by the brokers handling the sales. We perceive no abuse of the discretion lodged in the trial court in this connection. Additionally, we are of the opinion that

under the circumstances of the case the testimony is direct evidence of the fraudulent competition by the defendants with the company and of the means whereby their profits were accomplished.

 Another point complains that the trial court erred in admitting into evidence the letter of defendant Walden written prior to the organization of the plaintiff company, and delineating his objectives and purposes in promoting the same. We have copied the material parts of the letter elsewhere in the opinion. The objection, on behalf of the defendants Holloway and Beasley, was that such letter was completely irrelevant and immaterial to any issue in the case and highly prejudicial to their interests. In view of the allegations of conspiracy, the admission of the letter as circumstantial evidence tending to support the allegation, the trial court was justified in its admission. 15 C.J.S. Conspiracy § 29, "Admissibility of Evidence" p. 1043 et seq.; Vittitoe v. Junkin, 1932 (Tex.Civ.App., San Antonio), 54 S.W.2d 166, writ dism.

 Of the total amount of profits of the three defendants realized through the sales of their personal stock in competition with the company's sale of its new issue after the "ten for one" split, nearly $55,000.00 thereof was treated as profit in connection with the trade of 5,500 shares of Walden's stock for a new residence. The "trade" made was a former residence of Walden plus the stock at an agreed value of $10.00 per share. There was no direct evidence bearing upon the value of Walden's former residence "traded in". There was evidence that the new residence had a market value of $125,000.00. Obviously the agreed value of the property "traded in" was $70,000.00. It seems that Walden should be held to the values to which he agreed, and that as to him, at least, any calculation of his profits from the stock would be properly considered as though he actually received $10.00 per share for the stock. As to him such comprised the value of the "fruits" of his fraud, and his co-conspirators being liable along with him, they are to be held to the same measure in any calculation of profits wrongfully derived. See 15 C.J.S. Conspiracy § 18, "—Joint or Several Liability", p. 1028; and § 33, "Damages", p. 1054.

As a final point of error the defendants complain because the trial court recited in its judgment the fact that their acts were "in breach of trust and in usurpation of corporate rights and opportunities". The basis of complaint is two-fold, first, because the case was submitted on special issues by answer to which the question was presented to the jury, and, second, because the finding would be against the great weight and preponderance of the evidence. For obvious reasons the defendants have suffered no harm. T.R.C.P. 434. They would reap no benefit even if they were sustained on the point.

Judgment for plaintiff company against the defendants Holloway and Beasley, jointly and severally, for the $15,000.00 received as the result of the Jennings property real estate transaction, for $9,820.20 in unlawful commissions received from sale of stock, and for $169,084.50 received as profits from the sale of their personally owned stock in competition with the company in its sale of company stock is affirmed. Judgment for profits or damages in other respects, including exemplary damages, is reversed and rendered.

Liability of the defendant Walden, not a party before us on appeal, is established according to the original judgment entered by the trial court.

Costs of appeal are apportioned 50% against the company and 50% against the defendants Holloway and Beasley, jointly and severally.