INTERNATIONAL BANKERS LIFE IN-SURANCE COMPANY, Petitioner,

v.

Sterling C. HOLLOWAY and D. D. Beasley, Respondents.

No. A–8917.

Supreme Court of Texas.

April 24, 1963.

Rehearing Denied June 26, 1963.

H. Joe Loe, McGown, Godfrey, Logan & Decker, John W. McMackin, John B. Mc-Clane, Winfred Hooper, Jr., and Warren W. Shipman, III, with above firm, Fort Worth, for petitioner.

Cantey, Hanger, Johnson, Scarborough & Gooch, Sloan B. Blair, with above firm, Fort Worth, R. R. Holloway, Brownwood, Black & Stayton, Austin, for respondents.

STEAKLEY, Justice.

International Bankers Life Insurance Company, an insurance corporation, plaintiff below and so referred to in this opinion, brought suit against Sterling C. Holloway, D. D. Beasley and J. W. Walden, defendants below and so referred to. Plaintiff's suit charged defendants with conspiracy, breach of fiduciary duties as officers and directors of plaintiff, mismanagement and misappropriation of corporate funds belonging to plaintiff, and the usurpation and appropriation of corporate opportunities.

The trial court entered judgment for plaintiff, based on jury findings, in the sum of $228,979.70, and, additionally, in the sum of $339,714.24 as exemplary damages.

The defendants Holloway and Beasley appealed. The Court of Civil Appeals affirmed the judgment for plaintiff to the extent of the recovery in the sum of $193,-904.70 and reversed and rendered the judgment as to exemplary damages. Tex.Civ. App., 354 S.W.2d 198.

The phases of the case before us for decision were submitted to the jury by means of special issues segregated as to the following transactions: a personal profit of $15,000.00 realized by defendants on the purchase by plaintiff of a tract of land

identified as the Jennings property; the receipt by defendants of commissions in the sum of $9,260.58 on the sales to the public of a $20.00 stock issue of plaintiff and a conversion item relating thereto of $559.62; and profits in the sum of $169,084.50 realized by defendants from the sale of their personal stock in competition with the sale of plaintiff's stock during the period of April 1, 1955, to September 6, 1955.

The basic issues found by the jury favorably to plaintiff regarding each of the foregoing transactions (other than the item of $559.62 for conversion) were phrased in terms of the defendants' having "entered into a combination by their concerted action," respectively, "to realize a profit to themselves" (Jennings property), "to receive commissions personally on the sale of the $20.00 stock issue of International Bankers," and "to dispose of their personal stock in competition with the company stock during the period from April 1, 1955, to September 6, 1955." Similar special issues were conditionally submitted, and were not answered, with respect to a combination of any two of the defendants; and, finally, with respect to the acts of the defendants individually.

Also, as to each transaction, issues were submitted inquiring whether defendants acted with malice entitling plaintiff to exemplary damages; each of these issues was answered favorably to plaintiff and exemplary damages were found by the jury as to each transaction.

The judgment entered by the trial court was joint and several against the three defendants.

The points of error of defendants regarding the property, commissions and conversion transactions are, in essence that there is no evidence of a conspiracy or that defendants entered into a combination or engaged in concerted action; and that the trial court erred in the form in which their pleas of limitation were submitted to the jury.

Defendants asserted the same points of error with respect to the personal stock sales transaction and, in addition, that they may not be held liable by reason of the sales of their personal stock during the time of the public offering of plaintiff's stock unless such personal sales deprived plaintiff of the opportunity to sell its shares. In this latter respect defendants say that there must be findings that plaintiff could or would have sold its new issue stock to purchasers of the stock of the defendants had defendants not sold their personal stock to such purchasers; that there is no evidence to support such findings; that defendants had the legal right to sell their personal shares while plaintiff was selling its new issue stock; that the profits realized by defendants on the sales of their personal stock are not a proper measure of plaintiff's recovery; and that there is no evidence that the defendants realized the profits found by the jury.

Also, regarding their pleas of limitations, defendants urge additionally as to the personal stock sales transaction that plaintiff's cause of action is barred by limitation for the reasons that certain officers and directors of plaintiff, including certain disinterested directors, had actual knowledge of such sales more than two years before suit was filed, which knowledge is chargeable to plaintiff; that the books and records of plaintiff reflected such sales more than two years before suit was filed which was notice to plaintiff; and that, in any event, there is a question of fact regarding notice to plaintiff, and whether the agents of plaintiff exercised diligence in discovering the alleged fraud of the defendants.

The defendants present no point of error attacking the form of the liability issues underlying the recovery of the plaintiff corporation for the profits realized by the defendants in the Jennings property transaction and in the commissions transactions. The defendants do attack the special issue submissions underlying plaintiff's recovery for the profits realized by defendants from

the sale of their personal stock in competition with the sale of plaintiff's stock.

Plaintiff's application for writ of error was granted on points of error complaining of the judgment of the Court of Civil Appeals reversing the judgment of the trial court awarding exemplary damages.

The following résumé of the facts will serve as the basis for the decisional sections of our opinion in which we hold there was no error in the judgments below awarding plaintiff a recovery of the profits realized by the defendants in the sale to plaintiff of the Jennings property and for the commissions, including the related conversion items, received by defendants on the sale of the $20.00 stock issue of plaintiff; in which we hold there was error in the judgment of the Court of Civil Appeals reversing and rendering the recoveries for exemplary damages; and in which we hold there was error in the judgments below in favor of plaintiff for the profits realized by defendants from the sale of their personal stock in competition with the sale of plaintiff's stock.

■ We also hold that the issues involved in the separate claims and transactions are severable within the contemplation of Rule 503, Texas Rules of Civil Procedure, and accordingly sever into one cause the claims of the plaintiff corporation based on the Jennings property, the commissions and conversion transactions, and into another cause the claim of the plaintiff corporation based on the personal stock sales of the defendants in competition with the corporation. This is in keeping with the disposition of a similar problem in Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, 398. Plaintiff's suit involved one controversy between the parties but asserted separate claims against the defendants growing out of separate transactions. Each of the claims was based on a severable part of the controversy and a judgment on one would not be res judicata of the other. The situation is one where justice is done by the affirmance of the judgment as to severable issues fairly tried since they are sufficiently independent of the issues improperly tried so as not to prejudice the rights of either party.

## HISTORY OF PLAINTIFF'S OFFICERS AND DIRECTORS; AND ITS STOCK INCREASES

Plaintiff was incorporated on November 25, 1952. From then until March 9, 1954, defendants were its principal officers and directors. Walden of the defendants was an officer during 1954; he was president and treasurer with Thomas L. White, his brother-in-law, as vice president, and Audine Jones as secretary. The board of directors was increased to six during the year, three of whom were the defendants, and in August of the year a seventh director was elected. At the annual stockholders meeting on March 9, 1954, defendants owned 55.7 per cent of the stock represented at the meeting, but by means of proxies their control was 81 per cent.

During 1955 (between April 1 and September 6 of which year defendants sold their personal stock) Walden was the only defendant who was an officer of the corporation; he was elected president on March 8, 1955, and resigned on April 12, on which date he was elected executive vice president. George V. Brooks succeeded Walden as president and apparently served until December 21 of the year at which time William J. Shirley was employed by the executive committee as president. The vice presidents were Thomas L. White and Edgar H. Keltner, Jr. The secretary was Audine Jones, with Walden apparently serving as treasurer until December 21 when he was succeeded in this position by William J. Shirley. Audine Jones served as assistant treasurer from June 6, 1955, until January, 1956.

The three defendants served on the board of directors during the year 1955, and the defendant Beasley was chairman of the board until October 6, when he was succeeded by O. C. Armstrong. The board was increased to twenty members during the year. A two-man executive committee of

the board of directors was authorized on March 8, 1955, with Walden and Armstrong as its members; this was increased during the year to four members, and later to eight members, with Beasley as chairman and Walden as a member. At the March 8, 1955, annual stockholders meeting, the defendants owned 43.5 per cent of the stock represented but controlled 83 per cent of the votes by proxies.

During 1956, William J. Shirley continued to serve as president until his resignation on March 22, with the office apparently vacant until December 17, 1956, when R. M. Hazlewood was elected president. Walden served as executive vice president until his resignation on January 11. The office remained vacant until May 22, on which date Beasley was elected and served as executive vice president until December 17, 1956. Walden and Beasley served on the twenty-one member board of directors until Walden's activities came under question, and on June 4, 1956, he was relieved of all positions with the corporation. Defendant Holloway was neither an officer nor director during 1956; he was elected to the board of directors and executive committee on the 10th day of September, but did not serve and formally resigned from both positions on November 26, 1956, effective as of the date of his election. The vice presidents of the corporation during 1956 were Beasley, Edgar H. Keltner, Jr., Minar Grizzard, and defendant Walden until he was relieved of all positions on June 4. Minar Grizzard served as secretary from March 13 until September 10, at which time he resigned. The record does not indicate that there was a permanent secretary between September 10 and December 17, 1956, at which time Edgar H. Keltner, Jr., was named to the office. William J. Shirley served as treasurer until his resignation on May 22.

It is thus seen that for the years 1955 and 1956, Walden was the only one of the defendants holding office during 1955; that the three defendants were three of a twenty-member board of directors and two of an eight-member executive committee; that

Walden was relieved of all official positions with the corporation on June 4, 1956, from which time Beasley was the only defendant holding office as a member of the board of directors or of the executive committee. It also appears that the defendants had 39.5 per cent of the stock represented at the March 13, 1956, stockholders meeting, but by means of proxies controlled 53 per cent of the stock represented.

At the time of commencement of business in December of 1952, plaintiff corporation authorized and issued 2,500 shares of stock, ninety per cent of which was owned by the three defendants. On July 29, 1953, the corporation voted to authorize 13,750 additional shares of $10.00 par value stock to sell at $20.00 per share. The articles of incorporation were not amended at the time to increase the capital structure by the newly authorized shares; the plan was that subscriptions were to be sold on the to-be-issued stock and the articles were to be amended to reflect the additional subscribed stock when substantial subscriptions had been obtained. For example, on November 30, 1953, when it was reported that 2,500 shares of the new stock issue had been fully subscribed, the articles were amended to increase the capital structure to 5,000 shares, consisting of 2,500 shares authorized and sold at the time of the incorporation and the additional 2,500 shares. This practice continued until August 26, 1954, when 12,500 shares were authorized.

On September 20, 1954, it was voted to discontinue the foregoing sales (about 3,750 shares not having been subscribed) and to authorize a pre-emptive offering of 12,500 shares of $10.00 par value stock. These new shares were to be offered on a pro rata basis, the offer to remain open for at least thirty days. The three defendants purchased 5,589 of these new shares, as follows: Beasley, 1,308 shares; Holloway, 1,550 shares; and Walden, 2,731 shares.

At the March 8, 1955, board of directors meeting it was voted to authorize two classes of stock consisting of common stock

without par value and cumulative preferred stock with $10.00 par value. 350,000 shares of the new non-par common stock were to be issued with 250,000 shares to be exchanged for the 25,000 shares presently outstanding; the remaining 100,000 shares were to be issued and sold at such times and for such consideration as the board of directors might fix. Thus, there was a ten-to-one stock split which increased in the hands of its holders all the stock previously sold.

At a special board meeting on April 12, 1955, it was voted upon motion of the defendant Beasley, who was chairman of the board, to offer for sale the first lot (apparently consisting of 10,000 shares) of the 100,000 new shares at $10.00 per share. The record shows that a further special meeting of the board was held on May 30, 1955, at which time it was voted to offer for sale a second lot consisting of 10,000 shares at $12.50 per share. The record is not altogether clear at this point but indicates that at the time the offering price was increased from $10.00 to $12.50 per share, only a small portion of the original lot had been sold at $10.00 per share.

It is also to be noted that the defendants came into ownership of 88,930 shares of stock of the corporation at a cost to them of between $1.00 and $1.60 per share by means of the preemptive offering and the ten-to-one stock split; of the 88,930 shares, the defendant Beasley owned 20,580, the defendant Holloway 23,000, and the defendant Walden 45,350.

In the section to follow, reviewing the evidence pertaining to the separate transactions, references are made to a corporation identified as the Fort Worth Corporation. We agree with the Court of Civil Appeals that this corporation was the alter ego of the defendants Holloway and Beasley and that the corporate fiction is to be disregarded. The evidence establishes that the Fort Worth Corporation was a mere conduit for the accomplishment of the purposes of these defendants with respect to the Jennings property transaction and to the commissions received by the three defendants through the corporation; it will not serve as a shield to protect them from liability. See First National Bank in Canyon v. Gamble, 134 Tex. 112, 132 S.W.2d 100, 125 A.L.R. 265; Continental Supply Co. v. Gilmore Co., Tex.Civ.App., 55 S.W.2d 622, wr. dism.

## THE SEPARATE TRANSACTIONS

### a. The Jennings Property

A tract of land known as the Jennings property was purchased in the name of the Fort Worth Corporation for a consideration of $62,500.00. The purchase contract was dated January 30, 1954, and was in the name of one C. W. Trigg acting for the Fort Worth Corporation. The purchase contract required the payment of $5,000.00 to an escrow agent with one-half of the remaining purchase price to be paid at the time of the closing, and the remainder to be paid within 120 days. Holloway and Beasley loaned the Fort Worth Corporation the sum of $5,200.00 with which to make the earnest money payment and for closing expenses. During the period of January 30, 1954, and April 1, 1954, with the defendant Beasley representing the plaintiff corporation, there was negotiated a contract of sale under which plaintiff purchased the Jennings property from the Fort Worth Corporation for the sum of $77,500.00; this represented a profit to the Fort Worth Corporation of $15,000.00. The owners of the Jennings property executed a deed to the Fort Worth Corporation under date of March 25, 1954. The deed recited a consideration of $62,500.00 and carried $68.75 in federal revenue stamps, which was the proper amount. The Fort Worth Corporation executed a deed to plaintiff under date of April 15, 1954, with the deed reciting a consideration of $10.00 and other valuable consideration, and carrying federal revenue stamps in the same amount of $68.75. Payment of the consideration of $77,500.00 to the Fort Worth Corporation was by means of two checks of plaintiff, one of which was signed by the defendant Beasley in the sum of $32,500.-

00, dated April 1, 1954, and bearing the legend "part payment on building"; on this same date of April 1, the Fort Worth Corporation paid the Jennings heirs the sum of $26,023.12 on the purchase price of the property. The other check was signed by defendant Walden in the sum of $45,000.00, dated April 9, and bore the legend "final payment on building"; on this same date Fort Worth Corporation paid a bank loan, the proceeds of which had been used to pay a part of the consideration for the Jennings property. It has been noted above that the deed from Fort Worth Corporation to plaintiff was not executed until April 15. Under date of April 9 two checks were issued by the Fort Worth Corporation to defendant Holloway, one of which was in the sum of $2,600.00 and bore the legend "repayment of loan," and the other in the sum of $4,928.00 and bore the legend "salary $5,000.00," less social security. Under date of April 14 two checks were issued by the Fort Worth Corporation to the defendant Beasley, one of which was in the sum of $2,600.00 and the other in the sum of $4,-052.00, and bore the same legends as the two checks to the defendant Holloway. Under date of May 24 a check was issued by the Fort Worth Corporation to the defendant Walden in the sum of $5,750.00, and bore the legend "commission on real estate and stock transfers."

### b. Commissions

The second and third transactions (generally referred to herein as the commissions transaction) forming the basis of the jury findings pertained to commissions on the sale by plaintiff of its $20.00 per share stock issue which was authorized on July 29, 1953, at a time when the defendants were the principal officers and directors of plaintiff. The subscription price of $20.00 cash included a commission expense not to exceed 20 per cent. J. L. Walden, brother of J. W. Walden, was given a contract to sell the stock for a commission of $4.00 per share. An informal arrangement came about between the Fort Worth Corporation, J. L.

Walden, and the plaintiff corporation, having to do with sales by J. L. Walden on an installment basis. The net effect of the evidence is that J. L. Walden split his commissions received from plaintiff with the Fort Worth Corporation to the extent of $13,035.50, the purported consideration for which was assistance rendered Walden, particularly in financing installment sales. There is no evidence of any contract of guaranty between plaintiff and the Fort Worth Corporation pertaining to the installment purchases, or that the latter suffered any loss in connection therewith. It appears that stock purchased on an installment basis was not delivered to the purchaser until fully paid. The only advancement made by the Fort Worth Corporation to the plaintiff in connection with installment sales was on June 18, 1954, consisting of an advance of $12,500.00 which was repaid to the Fort Worth Corporation. The defendants Beasley and Holloway each received $2,950.00, and the defendant J. W. Walden received $3,360.58, out of the commissions which J. L. Walden received from plaintiff. This is the total sum of $9,260.58 found by the jury. After the termination of the $20.00 stock issue sale there remained in the stock subscription account of the corporation the sum of $559.62. Two checks in the sums of $83.00, dated March 4, 1955, and $476.62, dated March 7, 1955, were drawn on this account by checks signed by the defendants Beasley and Walden. The checks were payable to the Fort Worth Corporation, and depleted the stock subscription account. They were indorsed in the name of the Fort Worth Corporation to "Sterling Holloway, Agent." These two checks are the basis of the conversion items of $559.62 found by the jury.

### c. The Sales of Personal Stock

In the fourth transaction the jury found that the defendants realized a profit of $169,084.50 from the sale of their personal stock in competition with the sale of corporation stock during the period from April 1, 1955, to September 6, 1955. We have pre-

viously reviewed the stock ownership of the defendants resulting from the pre-emptive offering and the ten-to-one stock split authorized by plaintiff on September 20, 1954, and on March 8, 1955, together with the special board meetings on April 12 and May 30, 1955, authorizing a public offering of plaintiff's stock in two lots of 10,000 shares at $10.00, and later $12.50 per share.

During the period in question the defendants sold 29,711 of their personal shares at prices either corresponding to, or below, the offering price of plaintiff's stock. There was testimony by the purchasers of the personal stock establishing that in many instances they considered their purchases to be of plaintiff's stock either because of representations to such effect by the salesmen or because of the use by the salesmen of the prospectus issued by plaintiff in connection with its public offering.

During the period in question, 7,500 personal shares of the defendants, divided 2,500 shares each, were contributed to a share pool established for the purpose of interesting outsiders in becoming directors of plaintiff and with the stock to be sold at $5.00 per share. At least six of the purchasers from this share pool accepted office as a director of plaintiff and various of them attended directors meetings during the years of 1955 and 1956.

### THEORY OF RECOVERY

The recovery of plaintiff for the profits found by the jury to have been realized by the defendants in the various transactions is founded on the equitable principle which calls corporate officers and directors to account to the corporation for personal profits realized by them in breach of their fiduciary duties. Two classes of cases in the area of fiducial responsibility of officers and directors of a corporation are present here. One class involves contracts between the corporation and its fiduciary, represented by the Jennings property transaction in which the plaintiff corporation recovered the profits realized by the defend-

ants through the instrumentality of the Fort Worth Corporation. The other class involves personal activities of a corporate fiduciary in matters of corporate interest, represented here by the sums received by the defendants through the Fort Worth Corporation from the sale of the $20.00 stock issue of plaintiff corporation, and by the personal profits realized by the defendants in the sales of their personal stock in competition with the sale by the corporation of its stock. In each instance the defendants have been found using the corporation for their personal profit in situations where they were under the duty of acting in good faith and for the benefit of the corporation; in neither instance is there a finding of fairness to the corporation of the transactions producing the profits received by the defendants.

Corporate officers and directors are fiduciaries, and the consequences of their acts as such are determinable under the facts in each case. Paddock v. Siemoneit, 147 Tex. 571, 218 S.W.2d 428, 7 A.L.R.2d 1062. Contracts between a corporation and its officers and directors are not void but are voidable for unfairness and fraud with the burden upon the fiduciary of proving fairness. This Court in Tenison v. Patton, 95 Tex. 284, 67 S.W. 92, considered the problem of whether a contract which a director makes with the corporation is voidable at the option of the corporation or its stockholders without inquiry into the fairness of the transaction. In adopting the rule that such a contract may be upheld, with the burden on the director of establishing the fairness of the transaction to the corporation, this Court expressed full assent to the principle "which declares that a trustee, in dealing with trust property, cannot claim for himself, but must yield to the beneficiary, any profit which he makes." The opinion continued by saying that "The cases in which trustees have been held liable for profits, upon the principle stated, have generally arisen where, in the acquisition or disposition of property for the beneficiary, the trustee

has received to himself a profit, as when he has sold property for one price, and accounted to the corporation for a less price, or has bought at one price, and sold to the company at a larger one, or has received a secret bonus or advantage in the transaction in which he has acted for the corporation." See also Popperman v. Rest Haven Cemetery, 162 Tex. 255, 345 S.W.2d 715; Zorn v. Brooks, 125 Tex. 614, 83 S.W.2d 949; Milam v. Cooper Company, Tex.Civ.App., 258 S.W.2d 953, wr. ref. n. r. e. A corporate fiduciary is under obligation not to usurp corporate opportunities for personal gain, and equity will hold him accountable to the corporation for his profits if he does so. Transactions in which a corporate fiduciary derives personal profit, either in dealing with the corporation or its property, or in matters of corporate interest, are subject to the closest examination and the form of the transaction will give way to the substance of what actually has been brought about. One court has commented that a director of a corporation is held "in official action, to the extreme measure of candor, unselfishness, and good faith. Those principles are rigid, essential, and salutary." Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 123 N.E. 148. In speaking of the wise interposition of the law in relations which excite conflict between self-interest and integrity, another court has commented that the law "acts not on the possibility, that, in some cases, the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence and supersede that of duty." Michoud v. Girod, 4 How. 503, 11 L.Ed. 1076, 1099. A director who diverts profits from the corporation in violation of his fiduciary relationship is personally liable even though the profits are acquired by an agency controlled by the director. Durfee v. Durfee & Canning, Inc., 323 Mass. 187, 80 N.E.2d 522. The responsibility of the corporate fiduciary includes the dedication of his uncorrupted

business judgment for the sole benefit of the corporation. Perlman v. Feldmann, 2 Cir., 219 F.2d 173, 50 A.L.R.2d 1134. The rule of corporate opportunity charges the interest acquired by an officer or director of a corporation in violation of his duty with a trust for the benefit of the corporation; "a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty." Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503. Western States Life Insurance Co. v. Lockwood, 166 Cal. 185, 135 P. 496; 173 Cal. 734, 161 P. 498, considered the problem of profits received by the president, who was also a director of the corporation, as a secret partner in a firm contracting with the corporation to secure subscriptions to its capital stock. The court upheld recovery of the profits by the corporation against the contention that the services of the president and director were reasonably worth the amount received and that the amount was fairly earned. The court reasoned that the fiduciary was forbidden to make any secret profit and the activities of the fiduciary promoting the sale of subscriptions through the selling agency "must be held to have done in execution of his trust as such director." which rendered him accountable to the corporation for the personal profits realized therefrom.

The application of the foregoing principles to the facts pertaining to each of the transactions here, and to the jury findings, is clear. These well-established rules governing the duties of one occupying a fiducial relationship to the corporation and its stockholders unquestionably cast upon the defendants the burden of proving the fairness of the personal profits realized by them in each transaction. The defendants owed the duty of obtaining the Jennings property for the corporation at the best possible price. The profit which defendants sought to make for themselves through the instrumentality of the Fort Worth Corporation must be held to belong to the corporation. The same is true with respect to the sums received by the defendants, likewise

through the instrumentality of the Fort Worth Corporation, as a division of the commissions paid to J. L. Walden, the selling agent employed by the corporation. It is self-evident that it was the duty of the defendants to exert all efforts in behalf of plaintiff corporation to the end that the sale of its stock would net the corporation the greatest possible return. The substantiality of the profit of $13,035.50 realized by the Fort Worth Corporation in the light of all of the circumstances of the arrangement is incompatible with the duty of good faith owed the plaintiff corporation by the defendants. The jury convicted defendants of entering into a combination to realize a profit of $15,000.00 in the Jennings property transaction, to receive commissions in the sum of $9,260.58 from the sale of the $20.00 stock issue, and to convert the sum of $559.62. Under the record in this case it cannot be said as a matter of law that the defendants did not combine to do these things, as later discussed, or that their doing them was not a breach of their fiducial obligations to the corporation and its stockholders. The judgments below representing a recovery by the plaintiff corporation of these claims against the defendants must therefore stand.

For the reasons later shown, we hold that the judgments below, awarding plaintiff a recovery of the sum of $169,084.-50 representing the profits realized by the defendants from the sale of their personal stock in competition with the company stock, were in error. We also hold that on further trial the burden is upon the defendants to establish the fairness of the personal sales transaction to the corporation, and that plaintiff does not have the burden of establishing that the corporation could or would have sold its stock had the defendants not engaged in their competitive sales activities. The latter is no more than evidentiary upon the question of fairness, and upon the question of exemplary damages. The plaintiff corporation had a vital interest and expectancy in the sales by the defendants of their personal stock in competition with the sale by the corporation of its stock. The probability of harm to the corporation is self-evident and the defendants had every reason to anticipate that their activities in promoting the sales of their personally owned stock, and, in some instances, at prices below that at which the stock of the corporation was offered, would probably capture opportunities which might otherwise have been available to the corporation. We agree with the defendants that only under special circumstances should stockholders who are also corporate fiduciaries have the burden of proving fairness to the corporation in the sales by them of their personally owned stock, or presumptively become liable for profits made in such sales. This is a case of such special circumstances. Here the interests of the corporation justly called for protection by the defendants of the opportunities for the sale of the stock of the corporation; they were under a duty to act in all respects to further the purposes of the corporation in offering its stock for sale and cannot seize the opportunities for themselves.

We do not hold that a corporate stockholder and fiduciary is presumptively guilty of fiduciary breach in all cases when he sells personal stock during a time when the stock of the corporation is also on the market. We do hold that the making of such sales, under circumstances such as here, imposed on the defendants as stockholder-fiduciaries the burden of proving fairness when called to equitable accounting by the corporation.

## DEFENDANTS' PLEA OF LIMITATION

By a general point of error referring to all of the transactions and by special points referring to the sales by defendants of their personal stock and the receipt by them of commissions, defendants complain of the form of the issues submitted under their pleas of limitation which limited the notice chargeable to plaintiff to that obtained in a directors meeting or an executive committee meeting.

For the reasons presently to be discussed, we hold that these issues were in error as too restricted but that the evidence presents a fact question on defendants' pleas of limitation only with respect to the personal stock sales. In so doing, we hold as a matter of law that the suit of plaintiff for recovery of the profits of the defendants from the Jennings property transaction and for the receipts by them of the commissions, together with the conversion items, was not barred by limitation.

Under the basic issue regarding the personal stock sales, the jury found that the defendants entered into a combination by their concerted action to dispose of their personal stock in competition with the sale of corporation stock from April 1, 1955, to September 6, 1955. This suit was filed December 15, 1958, over three years thereafter. The two-year statute of limitations invoked by defendants will thus bar plaintiff's suit in this respect unless operation of the statute had not commenced before December 15, 1956. See Glenn v. Steele, 141 Tex. 565, 61 S.W.2d 810. The manner employed by the trial court for this determination was by means of a special issue (answered affirmatively by the jury) reading as follows:

> "Do you find from a preponderance of the evidence that the Directors of International Bankers in a Directors' meeting, or an Executive Committee meeting, did not discover that the defendants, Sterling C. Holloway, James W. Walden, and D. D. Beasley, disposed of their personal stock in competition with the sale of company stock during the period from April 1, 1955, to September 6, 1955, if you have so found, prior to December 15, 1956?"

The effect of the issue as worded was that the statute of limitations did not begin to run unless there was actual discovery that defendants were competitively disposing of their personal stock; that this discovery could only be by directors of plaintiff; and that discovery could only be

in a directors or executive committee meeting. The issue ruled out discovery by the exercise of diligence by the disinterested officers or directors of the corporation, together with actual discovery by them at any time other than in a directors or executive committee meeting.

In essence, plaintiff defends the restricted issue upon the propositions (a) that discovery can only be in an official meeting; (b) that under the facts of this case the only notice which would start limitation would be actual notice to its innocent officers and directors; (c) that limitations did not begin to run until defendants relinquished control of plaintiff (which plaintiff says was subsequent to December 15, 1956) and actual notice of the conspiracy was conveyed to plaintiff; and (d) that no officer or director had any hint of the conspiracy more than two years prior to suit under circumstances of imputable notice to plaintiff. It should be noted that the limitations issue inquired of discovery of the disposition of their personal stock by defendants, whereas the basic issue inquired if the defendants entered into a combination by their concerted action to dispose of their personal stock in competition with the sale of plaintiff's stock. It follows that the correctness of the limitations issue as submitted is to be measured by notice, or not, of the personal stock sales and not of the alleged conspiracy.

In Courseview, Inc. v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197, we pointed out that "[l]imitation does not begin to run in favor of a trustee and against the cestui until the latter has notice of a repudiation of the trust, and there is no duty to investigate at least until the cestui has knowledge of facts sufficient to excite inquiry." Further that "It is perhaps more accurate to say that the existence of a relation of trust and confidence does not change the rule that diligence in discovery of fraud is required but does affect the application of the rule." We recognized in Courseview that there can be situations showing no lack of diligence and in which there is no legal duty to use means available

for discovering fraud of the fiduciary (which consisted there of affirmative representations upon which the party could properly rely because of the relationship of the parties), but said "We are not prepared to say, however, that one in a relationship of trust and confidence is always justified as a matter of law in neglecting every precaution until something occurs to arouse his suspicions."

Plaintiff as a corporation could act only through its agents, and in our opinion notice to a corporation sufficient to activate the statute of limitations is not categorically limited to that acquired by directors in official meetings. The authority cited by plaintiff (3 Fletcher Cyclopedia Corporations, Sec. 793) recognizes the rule that notice to an officer or agent is notice to the corporation in the circumstance where the officer or agent in the line of his duty "ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation." We are clear in the view that it was the duty of the officers and directors of plaintiff to act upon notice, if such they had whether actual or constructive, of that which is charged against the defendants in this suit. The office of a corporation director or officer is more than nominal, and those assuming the duties and responsibilities of such offices are not justified in neglecting every precaution or investigation; it is their minimal duty and responsibility to protect the corporation against acts adverse to the interest of the corporation, whether perpetrated by fellow directors or by strangers to the corporation.

In the light of the foregoing, and from our study of the present record, we are of the opinion that there was presented a fact question as to whether the disinterested officers and directors of plaintiff had knowledge of facts sufficient to require them to exercise diligence by using the means available for discovering the personal stock sales activities of the defendants. We do not regard the fact that the

sales by defendants of their personal stock during the period of April 1, 1955, to September 6, 1955, were reflected in the stock transfer records charges the corporation with notice at such time as a matter of law. See Moore v. Waco Building Ass'n, 19 Tex. Civ.App., 68, 45 S.W. 974 (wr. ref.); Pacific Vinegar & Pickle Works v. Smith, 152 Cal. 507, 93 P. 85. This fact does make apparent that there were means available for discovering the activities of the defendants in the sales of their personal stock, and this becomes relevant if the disinterested officers and directors had knowledge of facts sufficient to put them on inquiry and impose on them the duty to exercise diligence by using the stock transfer records, and any other means available.

It is also our view that the present record presents a fact question as to the adversity of interest of C. B. Walden, Thomas L. White, Edgar H. Keltner, Jr., and Audine Jones. The defendants claim that each of the officers had knowledge of facts concerning the personal sales sufficient to put them on inquiry; plaintiff, in turn, attacks their disinterestedness. See Goldstein v. Union National Bank, 109 Tex. 555, 213 S.W. 584. This is particularly true of Audine Jones, who held the title of secretary of the corporation, and in such position handled the stock transfer records of the corporation. We add also that under the facts surrounding the original employment and duties of Audine Jones and her subsequent designation as secretary of the corporation, together with her responsibilities as such, it is our opinion that notice to her as custodian of the stock transfer records was not notice to the corporation as a matter of law of the personal stock sales of the defendants.

The point of distinction between the personal stock sales and the other transactions is that the facts concerning the latter are such that there is no reasonable probability that the disinterested officers and directors of plaintiff had knowledge of facts, or by reasonable diligence would have

come into knowledge of facts, sufficient to put them on inquiry. This is illustrated by the method of handling the Jennings property transaction which is reviewed earlier in this opinion. The exclusive contract for selling the $20.00 stock issue was given to an outsider whose arrangements with the defendants were through the Fort Worth Corporation. The primary objective of the exclusive sales contract was the sale of the company stock for the net return authorized, and the extreme improbability that a fiduciary of the corporation would participate in the commissions authorized to be paid to the outsider is a strong circumstance against there being any basis for the disinterested officers and directors to have been put on inquiry.

The sale by the defendants of their personal stock, on the other hand, was a matter of widespread activity which included the share pool arrangement established by the defendants. At least six of the purchasers at a price of $5.00 per share subsequently accepted office as director of the plaintiff corporation. The factual differences between the various transactions illustrate the distinction recognized by us in Courseview.

## CONSPIRACY

A civil conspiracy to be actionable must be one unlawful in itself or one accomplished by unlawful means; it consists of acts which would have been actionable against the conspirators individually. State v. Standard Oil Co., 130 Tex. 313, 107 S.W.2d 550; Delz v. Winfree et al., 80 Tex. 400, 16 S.W. 111. As heretofore discussed, the unlawfulness of the acts, and the means employed by, the defendants, inheres in the fiduciary breaches on their part and in the unfairness of the transactions to plaintiff corporation with respect to the personal profits realized by the defendants.

In view of the disposition of the judgments below based on the competitive sales by the defendants of their personal stock, we shall not consider the question of whether there was evidence to support the jury

finding of conspiracy with respect thereto. The evidence on the retrial of this part of the case may differ and should not be prejudged by us.

With respect to the property and commissions transactions (as well as the personal stock sales transaction) the Court of Civil Appeals held "that there was ample evidence to support the jury's findings of the three defendants' conspiracy." The defendants here assert that there was no evidence of conspiracy or that they entered into a combination or engaged in concerted action as found by the jury.

The problem of no evidence is to ascertain if there is any evidence of more than a scintilla. Gulf, Colorado & Santa Fe Ry. Co. v. Deen, 158 Tex. 466, 312 S.W. 2d 933.

It was early said by this Court in Jernigan v. Wainer, 12 Tex. 189:

"When men enter into conspiracies, they are not likely to call in a witness * * * In such cases the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses."

And in Whitmore v. Allen, 33 Tex. 355, that

"A conspiracy may be proven as well by the acts of the conspirators, as by anything they may say, touching what they intended to do."

The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators. Texas Public Utilities Corp. et al. v. Edwards et al., Tex.Civ.App., 99

S.W.2d 420, wr. dism.; Hawthorne et al. v. Walton et al., Tex.Civ.App., 30 S.W.2d 397, wr. dism.; American Rio Grande Land & Irrigation Co. v. Barker, Tex.Civ.App., 268 S.W. 506, no writ hist.; State v. Racine Sattley Co., 63 Tex.Civ.App. 663, 134 S.W. 400, no writ hist.; 12 Tex.Jur.2d § 22, p. 342; 11 Am.Jur. § 56, p. 585; 15 C.J.S. Conspiracy § 29, pp. 1043–1045.

■ The related acts of the defendants in the property and commissions transactions are reviewed in the forepart of this opinion. These acts give rise to inferences and deductions of concerted action and common design which may properly be drawn by, and are peculiarly within the province of, the trier of facts. They go considerably beyond scintilla, conjecture and surmise, and will not be further analyzed in view of the detailed factual résumé appearing elsewhere. It cannot be said as a matter of law that the defendants acted independently of each other and that there was no concert of action in their systematic activities in these transactions. To so hold would usurp the fact finding function of the jury, and of the Court of Civil Appeals, which in a conspiracy case is largely in the area of inferences and deductions which may be drawn from the facts and circumstances shown by the evidence. It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a given time prior to each transaction. Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions on the part of the three defendants.

■ We agree with the defendants that there was error in the admission of the letter dated September 29, 1952, from the defendant Walden to one Don Hauer, a third party. The letter was written prior to, and was not shown to have any connection with, the incorporation by the defendants of the plaintiff corporation. There is no evidence that the defendants Hollo-

way and Beasley had any knowledge of, or participated in, the writing of the letter. The letter did not pertain to any of the transactions in which the jury found conspiracy and was written considerably before the time of the transactions. It was not brought within the conditions of the rule permitting evidence of the declarations of a co-conspirator upon the establishment of a sufficient connection with the conspiracy forming the basis of recovery.

We do not, however, regard the admission of the letter reversibly harmful or prejudicial to the defendants with respect to the property and commissions transactions. The substantiality of the evidence and the proof of actual participation by the three defendants in these transactions, particularly in the fruits thereof, support the jury findings of concerted action. It is manifest from the text of the letter, which is quoted by the Court of Civil Appeals in its opinion, that its harm and prejudice to the defendants went chiefly to the personal stock sales and to the promotional aspects underlying the sales. There is nothing in the letter which is confirmatory of the property and commissions transactions; the plan of operation outlined in the letter refers to ways and means of inflating the value of stock for the benefit of those referred to in the letter as the original investors.

## EXEMPLARY DAMAGES

■ In addition to the judgment of the trial court awarding the plaintiff corporation a recovery for the profits realized by the defendants in the transactions, the trial court also awarded judgment in the sum of $339,714.24 as exemplary damages. The Court of Civil Appeals held that the exemplary damages were erroneously founded upon the jury findings of the amount of profits which the defendants realized, and reversed and rendered this phase of the case for the defendants. Our agreement with the holding of the Court of Civil Appeals, which sustained the recovery of the plaintiff corporation for the profits realized by the defendants in the property and commissions

transactions, requires a further decision upon the question of whether exemplary damages may be recovered with respect thereto. We hold that they may be as to these transactions but here, also, we will not prejudge this question on the record which will be made in the retrial of the severed cause relating to the personal stock sales.

There is a division of authority on the question of whether a court of equity can or will grant punitive or exemplary damages as incidental to equitable relief. See the annotation in 48 A.L.R.2d 947. The jurisdictions denying exemplary damages do so on the basis of one or more of the theories that a court of equity does not have such power; that the awarding of exemplary damages is incompatible with the principles and practice of equity; and that a litigant waives all claims to exemplary damages by seeking equitable relief. The trend of our decisions has been otherwise.

In the early case of Oliver v. Chapman, 15 Tex. 400, this Court affirmed a decree annulling certain deeds for fraud and awarding exemplary damages, and said:

"As to the alleged excessive damages, it has been settled by the repeated decisions of this court, that in actions of this nature, the jury may give exemplary damages, and in doing so, of course they were not restricted to the amount of damage, which the proof shows to have been actually sustained by reason of the fraudulent acts of the defendant."

The above statement appears to be the basis for the decisions in Western Cottage Piano & Organ Co. v. Anderson, 45 Tex. Civ.App. 513, 101 S.W. 1061, wr. ref., which, in turn, was relied on in Mossop v. Zapp, Tex.Civ.App., 189 S.W. 979, wr. ref.

In Bush v. Gaffney, Tex.Civ.App., 84 S.W.2d 759, no wr. hist., the court upheld the refusal of the trial court to award exemplary damages, notwithstanding a jury finding, in decreeing a rescission, award-

ing a money judgment and establishing a constructive trust. The court recognized that its holding was contrary to Oliver v. Chapman, Western Cottage Piano & Organ Co. v. Anderson, and Mossop v. Zapp, supra.

Briggs v. Rodriguez, Tex.Civ.App., 236 S.W.2d 510, wr. ref. n. r. e., involved a suit for rescission of a royalty deed on the ground of fraud, and for damages. The award for both actual and exemplary damages was affirmed. The majority opinion exhaustively reviewed the problem and cited Oliver v. Chapman as "[a]uthority for the proposition that a recovery of the consideration paid as a result of fraud constitutes actual damages, and will serve as a basis for the recovery of exemplary damages."

Briggs v. Rodriguez was cited with approval in Kress v. Soules, Tex.Civ.App., 255 S.W.2d 244 (reversed on other grounds, 152 Tex. 595, 261 S.W.2d 703) and in Tashnek v. Hefner, Tex.Civ.App., 282 S.W.2d 298, wr. ref. n. r. e.; the court in the latter case also cited Oliver v. Chapman and stated "[i]t is not the law, in our opinion, that in case of rescission of contract for fraudulent representation authorizing a rescission, that exemplary damages as well as actual damages may not be recovered."

The point of these decisions to the problem here, and as analyzed in Briggs, is the recognition that the general rule (that a recovery of exemplary damages cannot be based upon a breach of contract) should be restricted to cases in which the breach of contract does not also constitute a wilful tort, and to cases where actual, as distinguished from fictitious, contracts are breached. Where a plaintiff may proceed either in tort or in accordance with the theory of a common law assumpsit count predicated upon a fictional agreement, an election to pursue the latter remedy should not diminish his rights. Exemplary damages should be allowed when the act giving rise to a fictitious implied contract, and its breach, amounts to a wilful tort since the rule allowing exemplary damages where

the defendant acted wilfully, maliciously or fraudulently is one of general application.

In the case at bar the plaintiff corporation has elected to sue for the profits gained by the defendants in breach of their duties as fiduciaries. The acts of the defendants supporting the recovery are acts which equity considers to be wilful and fraudulent, regardless of what may have been the actual motives of the defendants; here, of course, the jury has found that the defendants acted with malice. The remedy elected by plaintiff should not preclude the recovery of exemplary damages, although the remedy selected in relation to the actual harm done the plaintiff, together with the nature of the acts of the defendants, are proper considerations in weighing the amount of an exemplary damages award against a complaint of excessiveness and, indeed, may be such as not to justify an award of exemplary damages. It is consistent with equitable principles for equity to exact of a defaulting corporate fiduciary not only the profits rightfully belonging to the corporation but an additional exaction for unconscionable conduct. There should be a deterrent to conduct which equity condemns and for which it will grant relief. The limits beyond which equity should not go in its exactions are discoverable in the facts of each case which give rise to equitable relief. In the property and commissions transactions the recovery by the plaintiff corporation of the profits gained by the defendants represents what should have accrued to the corporation in the first instance, and is not punitive. The defendants should have been acting for the benefit of the corporation all the while. We should not say to defaulting fiduciaries that the most for which they can be held accountable in equity are the profits which would have remained theirs had they not been called to account.

The defendants as appellants in the Court of Civil Appeals presented points of error attacking the exemplary damages awards as being excessive, and asserting that the jury findings supporting the awards were against the great weight and preponderance of the evidence. The Court of Civil Appeals did not pass upon these points because of its reversal and rendition of the judgment of the trial court awarding exemplary damages.

We sever into one cause the claims of the plaintiff corporation against the defendants based on the Jennings property, the commissions and conversion transactions. With respect thereto, the judgment of the Court of Civil Appeals is reversed and the cause is remanded to that court with instructions to affirm the recovery by the plaintiff corporation of the sums of $15,000.00, $9,260.-58 and $559.62, and to consider the points of error of the defendants as appellants before the Court of Civil Appeals which asserted that the awards of exemplary damages in the sums of $30,000.00, $18,520.00 and $1,-119.24, in connection with the Jennings property, the commissions and conversion transactions, respectively, were excessive, and that the jury findings supporting the awards were against the great weight and preponderance of the evidence.

We sever into another cause the claim of the plaintiff corporation against the defendants based on the sales by defendants of their personal stock in competition with the sales of the stock of the plaintiff corporation. With respect thereto, the judgments of the trial court, and of the Court of Civil Appeals, awarding the plaintiff corporation the sum of $169,084.50, and the judgment of the Court of Civil Appeals reversing and rendering the judgment of the trial court awarding plaintiff corporation the sum of $250,000.00 as exemplary damages, are all reversed, and the cause is remanded to the trial court for a new trial.

SMITH, GREENHILL and HAMILTON, JJ., dissenting.

SMITH, Justice (dissenting).

I respectfully dissent. When the facts are taken into consideration, we find that this court should be concerned primarily

with whether or not there is any evidence to support International's theory that Holloway, Beasley and Walden are jointly and severally liable to International for profits allegedly realized by the three as the result of a *conspiracy* entered into by the three to defraud the Company by the sale of their personally held shares of International, "no par stock" in competition with sales of International's "new issue" of no par stock of the same class. This court has before it a "no evidence" question. The Court has reviewed the transactions involved and has concluded that it cannot be said as a matter of law that Holloway, Beasley and Walden acted independently of each other and that there was no concert of action "in their systematic activities" in the transactions. Whereas, I submit that there is not a scintilla of evidence in this record that the three acted in concert in these transactions which include the sale of their personally owned stock, or that the three entered into a conspiracy as alleged by International.

### Sale of Personal Stock

Holloway and Beasley acted in concert, but the two at all times acted independently of Walden. However, International does not claim that Holloway and Beasley entered into a conspiracy. The Court has held that the Walden letter was erroneously admitted into evidence. This eliminates the chief evidence claimed by International to show a conspiracy as between the three. However, the Court gives International another chance to prove a conspiracy by remanding the case for a new trial. How does it accomplish a remand? The Court adopts the ingenious method of holding in favor of Holloway and Beasley on their alternative point that the trial court erroneously submitted the issue of time of discovery (limitations) by the Directors that the three had disposed of their personal stock in competition with the sale of Company stock. It is my view that this question should never be reached. If there was no conspiracy, then International's lawsuit against Holloway and Beasley is without foundation and must fall.

Directing my dissent at this point specifically to the question of conspiracy as to the stock sales, I find there is no direct evidence of a conspiracy or of concerted action. The jury found that Walden, Holloway and Beasley entered into a combination (International calls it a "preconceived plan") by their concerted action to dispose of their personal stock in competition with the sale by International of its new stock during the period from April 1, 1955, to September 6, 1955. During this period of time Holloway sold about 5,575 shares of personal stock at a net profit of approximately $23,704.00 and that Beasley sold about 5,480 shares at a net profit of some $24,025.00. The trial court and the Court of Civil Appeals have held Beasley and Holloway liable for an additional sum of $121,355.50 of profits realized by Walden. Now, if all of the stock was sold through the "concerted action" of the three defendants, they would surely be jointly and severally liable to International as joint tort-feasors, *provided,* of course, the sales of their personal stock gave International a cause of action. Apparently, International realizes that the three did not act in concert; and, therefore, has conceived the idea of a conspiracy or a "preconceived plan" in order to hold Beasley and Holloway jointly and severally liable for the actions of the defaulter, Walden. The Court says that *inferences* of concerted action may be drawn from joint participation in the four transactions and from enjoyment of the fruits of the transactions.

Beasley and Holloway cannot be held liable for damages that the jury awarded as the result of Walden's sales of stock or as to Walden's transactions. Walden acted alone in the matter of sale of his personal stock. There is no evidence of any agreement on the part of *all* with respect to their sale of personal stock or any of the so-called transactions. It is true there was an agreement between the three and one Lyle to participate in a 10,000 share pool to be used to obtain good directors for International. I can hardly believe that this

can be said to be a part of the alleged conspiracy or concerted action to sell personally owned stock in competition with International. The undisputed facts not only will not support an inference that the three acted in concert, but such facts show that Holloway and Beasley, on the one hand, and Walden, on the other hand, proceeded entirely independently in selling personal stock.

It is impossible to analyze all of the testimony in this voluminous record, but illustrative of my position, I will discuss some of the facts which support my view that there is no evidence in this record showing a conspiracy between Beasley, Holloway and Walden relative to any of these stock transactions. When it is once admitted that the Walden letter is not admissible, then, the following argument of Beasley and Holloway is perfectly sound and unanswerable:

"Together Holloway and Beasley sold about 11,055 shares of personal stock to September 6, 1955, for a total profit of about $47,720.00, or approximately $4.31 per share. During the same period Walden sold about 18,751 shares, *more* than Holloway and Beasley *together,* at a net profit of about $6.47 per share. *If these sales resulted from any agreement, combination or concerted action, Holloway and Beasley were imbeciles because Walden not only sold many more shares than they but his per share profit was in excess of $2.00 more than that realized by Holloway and Beasley.*

"Moreover, the fact that Walden was proceeding independently of Holloway and Beasley and *vice versa* is proved by Walden's trade of 5,500 shares, plus a house, for a valuable lake residence. Quite obviously this was a trade that presented itself to Walden that he, proceeding independently, took advantage of. It was not a trade made in pursuance of any agreement, combination or concerted action as between Holloway and Beasley, on the one hand, and Walden, on the other hand.

"Equally enlightening is the action of ,Walden and of Holloway and Beasley in purchasing shares that they thereafter sold. Walden bought shares from Sivula *for $2.00* per share and sold them for an average profit of about $5.00 per share. Holloway and Beasley bought shares from General Gates and sold them for an average profit of less than thirteen cents per share. These transactions simply cannot be explained upon the hypothesis of any agreement, combination or concerted action involving all defendants.

"The methods whereby the shares were sold reflect no relationship whatsoever between the sales of Holloway and Beasley, on the one hand, and the sales of Walden, on the other. Holloway and Beasley sold a large block of their stock *to Werner* under a written agreement. Walden was not a party to that transaction; *made no sales to Werner;* and sold only a *very few shares through him.*

"Plaintiff may argue that the sale to ,Werner by Holloway and Beasley was a simulated sale; that they were really selling shares *through* and not *to* Werner. This is of no significance here because irrespective of how the transaction be characterized, it is plain from the difference in roles played by Werner with respect to Holloway's and Beasley's shares and with respect to Walden's sales that there was no agreement, combination or concerted action as between Holloway and Beasley, on the one hand, and Walden, on the other hand.

"Walden sold many of his shares through Colbert. Holloway and Beasley had no dealings whatsoever with Colbert. Many of the shares originally owned by Holloway and Beasley were sold through LaBay. ,Walden had nothing to do with LaBay. Walden sold many of his shares directly to Golden Spread (General Clark being a

friend of his) and paid no commission thereon. Holloway and Beasley sold much less stock on which they paid no commission and sold it to different people, except for the sale to Clyde Weed, hereinafter discussed.

"Aside from the 10,000 share pool, the only possible instance of any concerted action by Walden, on the one hand, and Holloway and Beasley, on the other hand, was with respect to the sale to Clyde Weed. As heretofore shown, pp. 71–2, this transaction was handled in its entirety by Weed, who persuaded Holloway and Beasley to supply 500 shares each at $5.00 per share and who persuaded Walden to supply 300 shares at $5.00 per share.

"Walden sold some of his personal stock at $12.50 per share. Holloway and Beasley did not sell any of their personal stock at such a price.

"Walden testified that at the time it was made he had no knowledge of the sale by Holloway and Beasley of 5,000 shares each to Werner; and that even after he learned about the sale he had no idea how many shares of their personal stock were being sold by Holloway and Beasley.

"Walden stated that while he informed Beasley of his, Walden's, sales through Colbert, Beasley probably had no idea of how many shares Walden was selling through Colbert; and that Holloway didn't know of Walden's personal sales.

"Holloway testified positively that he didn't know about Colbert's sales of Walden's personal stock and didn't know that Walden had traded his personal stock for a residence on the lake until after he, Holloway, returned from Europe on October 4, 1955. Holloway also stated that prior to the time he began to sell his personal stock he had no knowledge that Walden was going to sell personal stock.

"It is likewise undisputed that Colbert had no contacts whatsoever with Holloway and Beasley except for brief contacts with Beasley while Colbert was a sub-agent for Werner, selling new issue stock for plaintiff. Moreover, LaBay, who was purchasing stock from Holloway and Beasley and who was selling stock ultimately supplied by them, had no contacts whatsoever with Walden.

"The long and the short of the matter is that, with the possible exception of the 10,000 share pool, the record contains no evidence whatsoever that Walden, on the one hand, and Holloway and Beasley, on the other hand, were acting pursuant to any agreement or had formed any combination or were taking concerted action in the sale of their personal stock. The most that can be said insofar as plaintiff's case is concerned is that Holloway and Beasley sold their stock as they had opportunities to do so, at a price they were willing to take, and that Walden disposed of his stock when he had opportunities to do so, at a price he considered satisfactory."

There is another specific example of "no evidence" of conspiracy between the three. The record reflects without dispute that Holloway was in Europe and knew nothing of the transaction whereby Walden traded 5,500 shares of his *personal stock and a home* for Cloer's lake residence. There is no evidence of an agreement, express or implied, between Holloway and Walden concerning this Walden 5,500-share transaction. Holloway did not know of the transaction until long after the fact. The record also reflects the same state of facts as to a $5,000.00 advance to a man by the name of Werner as it does with respect to Walden's 5,500-share trade.

This case has been fully developed. Every conceivable separate act on the part of Beasley, Holloway and Walden has been explored. Yet none of those acts show a

conspiracy absent the letter. This Court through the majority opinion is holding that the letter was not admissible as against Beasley and Holloway. I cannot imagine any additional facts that could be introduced upon another trial that would change the situation.

The Court of Civil Appeals makes a *factual* statement to the effect that Beasley, Holloway and Walden remained in complete control of the Company. The majority here seems to give some importance to the question of continued control and apparently is of the belief that maintaining control of the Company is some evidence bearing on the question of whether the three entered into a conspiracy to sell their personal stock. Control of the Company has nothing to do with the conspiracy. The three could have had control of the Company, yet proceeded separately in the sale of their personal stock or they could have proceeded pursuant to an agreement. My examination of this record leads me to conclude that Beasley and Holloway proceeded in the sale of their stock pursuant to an agreement, and that Walden proceeded independently. Assuming that inferences can be drawn that a conspiracy exists, the record contains no evidence whatsoever of a *profit* realized by Walden through the *exchange of 5,500 shares* of his personal stock, together with a *home,* for a lake residence. Evidence was introduced about the exchange, but such evidence falls far short of the required proof as to the consideration Walden received for his 5,500 shares. The "valuation established" in a trade is no evidence of market value whatsoever. The record is silent as to the market value of the Walden home and the market value of the lake residence. This being true, what Walden received for his 5,500 shares of stock is not capable of ascertainment. Under no circumstances, in my opinion, can the "Dear Don" letter on a re-trial be brought "within the conditions of the rule permitting evidence of the declarations of a co-conspirator requiring a showing of connection with the conspiracy forming the basis of recovery." This rule announced by the Court in this cause cannot be applied in this case as the record now stands. It is unreasonable to believe that any evidence on a new trial can change the situation. This for the simple reason that the Walden letter to Hauer was written by Walden long before any association between the three, long prior to the alleged formation of a conspiracy, and concerned a matter entirely foreign to the business of International.

There are many other instances pointed out by Beasley and Holloway which reflect error in the trial court and unless this court performs its duty, the same errors will likely occur upon a new trial. For example, Beasley and Holloway, in their pleadings, admitted all their stock sales and incorporated in their pleadings an accurate tabulation of their sales to the brokers and the brokers' sales to the ultimate purchasers. In spite of this, the trial court erroneously permitted detailed testimony of purchasers in regard to representations allegedly made to them by brokers, etc. This testimony came almost immediately after the Walden letter was admitted. The tabulated sales were taken from International's books and records. These tabulations reflected the date of sale, the number of shares sold, the purchaser, the profit realized upon the sale, and all other relevant matters. Apparently, the first error of the trial court was the admission into evidence of the letter. Although there was no evidence of authorization of the representations made by the brokers, such representations were admitted, no doubt, on the theory that such representations were in harmony with the spirit of the letter and tended to prove the ultimate fact of conspiracy.

### Plea of Limitations

This Court has held against International on the ground that the defensive limitation issue submitted to the jury was too restrictive, in that the issue told the jury that discovery by the so-called disinterested directors must be discovered in a Directors' meeting or an Executive Committee meet-

ing. The Court goes on to hold that "[i]t follows that the correctness of the limitations issue as submitted is to be measured by notice, or not, of the personal stock sales and not of the alleged conspiracy." My difference with the Court on this question is that the Court has misinterpreted this record in holding that it presented a fact question as to whether the disinterested officers and directors of International had knowledge of facts sufficient to require them to exercise diligence by using the means available for discovering the personal stock sales activities of Beasley, Holloway and Walden. There is no evidence of a conspiracy, and the record shows as a matter of law that the disinterested directors had actual knowledge of the Beasley and Holloway sales of personal stock more than two years before this suit was filed. Not only did International's stock ledger and other records that were readily available to all its officers and directors plainly reflect each and every sale by Beasley and Holloway of personal stock, there is no evidence that either defendant, or anyone else, through any representation or other action, induced the officers and directors of International not to look at the records. These officers and directors were charged with knowledge of facts plainly reflected by the records of the corporation, unless through some misrepresentation or otherwise, by the one sought to be charged, such officers and directors have been influenced not to consult the records. See: 1 Merrill on Notice, Sec. 409, p. 353; Curtis, Receiver v. Connly, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222; Calhoun v. The Maccabees, Tex.Com.App., 241 S.W. 101. As said in Merrill, supra:

"One should know what are contained in his own books and records, even though he does not keep them himself. He knows that they exist and should inquire how they affect his interests. This principle has been applied to charge a partner with knowing what appears on the books of his firm; a mutual benefit insurance society with knowledge of its own records; *and a corporation with matters entered on its books."* (Emphasis added)

Further, there is no evidence which could possibly present a fact question as to the adversity of interest of Audine Jones. Therefore, notice to Audine Jones was notice to the Corporation as a matter of law of the personal stock sales of Beasley, Holloway, and the sales made by Walden independently of Beasley and Holloway. The fact that Audine Jones began her services with International as a typist and stenographer does not mean that the evidence fails to show that she was an officer of the Corporation at all times pertinent to the sales of stock by the several defendants. The record shows that Miss Jones was secretary in charge of International's stock ledger and was charged with the duty of issuing and reissuing certificates reflecting the ownership of International's capital stock. The trial court attempted to eliminate Miss Jones from the notice picture by inserting in his judgment a supplemental finding that she was "adversely interested" to International. Apparently the trial court based this unwarranted supplemental finding on the fact that in July, 1955, she sold her 200 shares of stock. Miss Jones had actual notice of each and every sale made by each of the defendants and from time to time she, as secretary of International in charge of its stock ledger, effected the personal sales of stock made by Holloway, Beasley and Walden. For example, in April, 1955, long before the date of sale of her personal stock, Miss Jones had received, as secretary of International, a letter from Holloway informing her of his and Beasley's sale of 10,000 shares of personal stock to the Mr. Werner hereinabove mentioned. In fact, there is no evidence that Miss Jones, an officer of International and the very person designated by the Corporation to receive notice about the transfer of shares, performed any act indicating any complicity by her in the transaction complained of, nor is there any evidence of participation on her part in any conspiracy.

Neither is there any evidence of collusion with or domination of her by Beasley, Holloway and Walden or either of them. The record contains no dereliction whatsoever on her part. Nor is there any finding by the *jury* to such effect. It is clear, therefore, that notice to Miss Jones was notice to International. See: 3 Merrill on Notice, Sec. 1220, pp. 150–5; Goldstein v. Union National Bank, 109 Tex. 555, 213 S.W. 584 (1919); Graham Bros. Co. v. Galloway Woman's College, 190 Ark. 692, 81 S.W.2d 837 (1935); Rock Springs National Bank v. Luman, 6 Wyo. 123, 42 P. 874. The so-called disinterested or innocent directors cannot assume lightly the responsibility that goes with the privilege of being a director. They should not be permitted to recover from Beasley and Holloway when they either had full knowledge of every stock transaction or where the books reflecting such transactions were there for them to examine and read.

The knowledge acquired by Miss Jones was acquired in the scope of her duties as secretary or agent of International. I contend that notice to Miss Jones was notice to International. The Court below seems to go off on the theory that unless the employee is an officer who participates in the formulation of company policy, knowledge of the employee cannot be imputed to the Corporation. In fact, the Court of Civil Appeals has stated, in effect, that notice to "a mere stenographer whose duties never equaled those of the usual corporate executive officer occupying the position of secretary," was not notice to International because the scope of her authority was so limited as to preclude imputing her knowledge to International. See: 3 Merrill on Notice, Sec. 1229, pp. 171–4; American Surety Company v. Fenner, 133 Tex. 37, 125 S.W.2d 258. That International should not be able to escape the consequences of its agent's (Miss Jones') knowledge is made clear by the logic of Merrill's, supra:

"The principal who employs several agents, particularly if he parcels out various functions among them, creates knotty problems for the law of notice. Proper solution is all the more important since so much of our economic life is in the hands of corporations and other large business organizations.

"We may start with the relatively simple propositions that it is the duty of a principal to get to his agent the information necessary to prevent the latter from acting in the scope of his employment to the injury of the interest of others, and, similarly, *that it is the duty of an agent employed in a matter to get significant information which he possesses to the principal, or to other agents so employed.* Hence it follows that it is not at all necessary that all the members of a committee or all the officers or agents intrusted by a principal with authority to represent him in a certain matter should be shown to have knowledge in order to charge the principal with notice. Information to one such representative is sufficient. *The notice is not defeated by the fact that one agent, who should have reported but did not, has the significant knowledge, while the agent who acts does so in blissful ignorance.* Of course this principle *is particularly apt in respect to corporations,* which otherwise would have an opportunity to escape the consequences of their agent's knowledge; *but it applies as well to the natural person who acts through several representatives."*

So far as Thomas L. White is concerned, there is not a scintilla of evidence in the record reflecting upon White's integrity, unless it can be said that being a brother-in-law of Walden automatically rendered him adversely interested to International. White was a director and vice president of International, and as a matter of law, notice to him of the fact that Walden had sold shares of his personal stock was notice to International. White was a director and vice president from March 9, 1954, to July 11, 1955. He received knowledge of such sales in the early summer of 1955, or at

least prior to July 11, 1955. The sales involved were made between the months of April and September, 1955. There is not one word in this record that White acted in collusion with Walden, Beasley or Holloway, or was adversely interested to International by reason of the sale of personal stock or for any other reason.

## NO EVIDENCE THAT THE STOCK SALES BY BEASLEY ET AL. DEPRIVED INTERNATIONAL OF ANY CORPORATE OPPORTUNITIES

The burden was upon International to plead, prove and obtain findings that sales by the three of their personally held shares of stock deprived International of the opportunity to sell its new issue stock. Since the evidence shows that the sales of shares by the three deprived International of no "corporate opportunity" the jury's findings that the sales made by Beasley, Holloway and Walden were made *in competition with* the sale of company stock are not supported by evidence of probative force. International, in its early briefs in this court and by the insertion of the words "in competition with" in special issue no. 113, apparently realized that the named defendants could be held liable only in those instances in which International could have made the sale if given the opportunity to do so.

My only purpose in referring to the theory of recovery for deprivation of "corporate opportunities" is that in the event the Court maintains its present expressed purpose to remand this phase of the cause to the trial court for a new trial, the issues should not be tried upon inapplicable theories, but upon the only theory so far as stock sales are concerned. Assuming that International has a cause of action, then the trial court should be told that the present defendants, petitioners here, may not be held liable by reason of their sales of shares unless such sales deprived International of the *opportunity* to sell its shares. See:

Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503.

International cannot get away from its anchorage to the principle that the sale of personally owned shares must be shown to have been made in competition with the sale of company stock. Obviously, the trial court on the trial level adopted the theory advanced by International in submitting the issues to the jury. There can be no doubt but that the phrase "in competition with" was placed in special issue 113 in keeping with the realization by the trial court that Beasley et al. could be held liable to International for profits realized through the sales of their personal stock *only* in those instances where International could have made the sale if given the opportunity to do so. Unless an issue submitting this theory in proper form is given, and unless there is evidence of probative force supporting an affirmative finding, International cannot recover.

The issue is not whether a specific sale by Beasley et al. was in competition with International's sales of its new issue stock, but the ultimate issue is whether International could have made the sale had Beasley et al. not competed. This leads me to say that, in addition to there being no evidence that International could have made the sales, the trial court improperly submitted the issue to the jury. A finding that a sale by a defendant was "in competition with" International's sales of its new issue shares is not a finding that International could have made the sale if given the opportunity to do so. In other words, it would not be a finding that International was deprived of any "corporate opportunity." The present record demonstrates that International cannot recover upon the theory it advanced; it cannot recover upon a jury verdict that each of some 200 or more specific sales of personally held shares was "in competition with" International's sales of its new issue stock. Should the case be remanded for trial, it is my judgment that International has fully developed its case and can do no better in a second trial.

Therefore, the judgment allowing International the sum of $169,084.50 against Holloway and Beasley, as profits from the sale of the personal stock owned separately by Holloway, Beasley and Walden should be reversed and rendered for Holloway and Beasley.

### The Jennings Property Transaction

The Court has affirmed the judgment of the Court of Civil Appeals which allowed International a recovery of profits realized by Holloway and Beasley in the sale of the Jennings property. I have no particular quarrel with the Court's holding that this is a severable issue, but I vigorously disagree with its holding that the issue as to the Jennings property was fairly tried in the trial court, and that "justice is done" by the affirmance of this severable issue.

The first 52 issues contained in the court's charge pertained to the Jennings property. Inquiry was made as to the three collectively, then the jury was told that if it answered issues no. 1 and 18 "No," and only in that event, it should answer issue no. 32. Then followed a series of issues as to each defendant, individually. None of these issues were answered, because the jury had answered issue no. 1, "Yes," and had not answered issue no. 18, because the court had instructed the jury not to answer said issue only in the event it had answered issue no. 1, "No."

Issue No. 1 reads as follows:

"Do you find from * * * the evidence that prior to or at the time of the execution of the original purchase contract dated January 30, 1954, the Defendants, Sterling C. Holloway, James W. Walden and D. D. Beasley, entered into a combination by their concerted action to realize a profit to themselves on the purchase by International Bankers of the Jennings tract?"

The jury answered, "Yes."

In answer to issue no. 2, the jury found that the three realized a profit. And in answer to issue no. 3, the profit so realized was found by the jury to be $15,000.00.

The jury also found that the three acted with malice and awarded exemplary damages in the sum of $30,000.00. The court defined malice, used in the charge, as meaning ill will, bad or evil motive, or such gross indifference to the rights of others as will amount to a willful or wanton act. The court instructed the jury that the award of exemplary damages is intended as a warning or an example to prevent the person or persons who committed the wrongful act and others from the commission of like offenses and wrongs. My purpose in discussing this feature of the case before presenting the reasons as to why issue no. 1 and its companion issues should never have been submitted is to refute the idea that Holloway and Beasley received a fair trial and were not injured by the introduction of the "Dear Don" letter. It is beyond the realm of reason, in view of the introduction of the letter without instructions limiting its effect, to conclude that because there is nothing said therein with reference to the Jennings property, that its harm and prejudice went only to the personal stock sales and the promotional aspects underlying the sales.

How can this court say that the introduction of the letter was harmless so far as the Jennings property is concerned when no distinction was drawn in the trial court? The jury heard the court's definition of malice and the reasons for the granting of exemplary damages. The jury heard the argument of counsel for International. Under our rules, it is encumbent upon a plaintiff's attorney to discuss the evidence which he thinks supports an affirmative answer to each issue upon which he relies. In our case, the attorney naturally bore down on the "Dear Don" letter as part of the evidence going to support a "Yes" answer to issue no. 1 relative to the Jennings property. I contend that the judgment of the courts below should be reversed and rendered. However, if the Court maintains its position that the cause should be remand-

ed as to the stock sales and that on a retrial such letter could possibly be admissible on that issue, then the Court should remand the entire case and direct the trial court to enter an order severing the two causes. No judgment should be rendered against Holloway and Beasley as to the Jennings property in the face of the letter being in evidence.

Reverting now to the reasons for reversing and rendering judgment for Holloway and Beasley as to the Jennings property:

There is no evidence to support the jury's finding "that prior to or at the time of the execution of the original purchase contract dated January 30, 1954" for the Jennings tract, Holloway, Beasley and Walden entered into a combination by their concerted action to realize a profit to themselves on the purchase of said tract by International.

Holloway and Beasley objected to the submission of issue no. 1 on the grounds of no evidence. They also moved for instructed verdict on said ground among others. Holloway and Beasley objected to issue no. 1 further on the ground that there was no pleading on the part of International to support the submission of such issue; that the issue assumes that the Fort Worth Corporation's corporate entity was to be disregarded; that such issue presupposes that the transaction inquired about was unlawful; that no harm or damage was shown, but to the contrary the evidence was to the effect that International received value commensurate with the purchase price paid by it for such property; that all transactions were a part of the records of International at the time of the transaction, in so far as the purchase price of the property was concerned, and also the deed records showed the consideration paid by the Fort Worth Corporation for such property, and the records of International from the date of the Jennings property purchase showed that it paid $15,000.00 more for such property than was paid for such property by the Fort Worth Corporation. As to this last objection, there is no question but that International's claim for damages as to the Jennings transaction was barred by the Statute of Limitations as a matter of law.

The record also shows, as claimed by Holloway and Beasley, that no harm or injury resulted to International. Holloway and Beasley offered to rescind and International refused. Therefore, there was no basis for a cause of action for damages as to the Jennings property aside from all of these objections. I respectfully call attention to one other objection to the charge. It reads as follows:

"These defendants further object and except to Special Issue No. 1, for the reason that the evidence is without dispute that the initial contract and initial sale was to the Fort Worth Corporation, a corporate entity, and while plaintiff has plead that the Fort Worth Corporation was merely a tool or vehicle for the handling of such transaction, the burden of proof is on plaintiff to prove such allegation, and the burden does not shift to the defendants with respect to the transaction until such time as plaintiff has proved a fictional character of the Fort Worth Corporation. The evidence is all one way to the effect that the sale was made to the Fort Worth Corporation and in turn there was a sale from the Fort Worth Corporation to the plaintiff."

These questions are presented to this court by points 17, 18, and 19 in the Holloway and Beasley application for writ of error. I stress objection no. 7 because it strikes at the heart of this Jennings transaction in the event it is held that there is evidence to support the finding of the jury in answer to issue no. 1, and further in the event the Court holds that International's cause of action as to the Jennings property is not barred by the Statute of Limitations of Texas.

I submit that International cannot reach Holloway and Beasley in its suit for damages as to the Jennings transaction until and unless it discharges its burden of proving that the Fort Worth Corporation was

a sham or merely the alter ego of Holloway and Beasley. This proof is completely absent from this record. The Fort Worth Corporation was organized and operated as an investment corporation. It operated as a corporation in buying and selling the stock of Continental Life Insurance Company, in negotiating for the purchase of real estate and in actually purchasing the Jennings tract, and in holding stock of corporations engaged in the business of acquiring real estate. Fort Worth Corporation had a perfect right and was clothed with the power to enter into the agreement with J. L. Walden.

It is well settled that the corporate entity may be disregarded only when the evidence will support a finding that it is merely the alter ego of its stockholders. Ballastine: Corporations, revised ed., Sec. 122, pp. 292–3; 1 Hildebrand, Texas Corporations, Sec. 30, p. 153; Tinnin v. Wilkerson, Tex.Com. App., 58 S.W.2d 69; Moroney v. Moroney, Tex.Com.App., 286 S.W. 167; Nichols & Co. v. Secretary of Agriculture, (C.C.A. 1), 131 F.2d 651, 136 F.2d 503; John L. Denning & Co. v. Commissioner of Internal Revenue (C.A. 10), 180 F.2d 288; McComb v. Aibel, (D.C.E.D.N.Y.), 100 F.Supp. 752.

The mere fact that the owners of stock in a corporation or their nominees ultimately receive the profits made by the corporation is immaterial. Such is only an incident of their ownership of the stock in the corporation.

I respectfully submit that judgment should be rendered for Holloway and Beasley on the Jennings prong of this case. For a case illustrative of the difference between a case in which a parcel of property is purchased by officers and directors with the *then* intention of selling it to their corporation for a profit and a case in which the idea of selling the property to the corporation is reached after its purchase, I cite that of New York Trust Company v. American Realty Company, 244 N.Y. 209, 155 N.E. 102. The present case was submitted according to the holding in this New

York case, but there simply is no evidence to support the finding in answer to such issue. When the Court appreciates the form of Issue no. 1, and realizes that Walden was not a stockholder in the Fort Worth Corporation, and further realizes that the record contains no evidence that "prior to or at the time of" the execution of the purchase contract Walden had any knowledge of the purchase, and when the Court fully realizes that the record contains no evidence that prior to or at the time of the execution of the contract, Holloway and Beasley had any idea of selling the Jennings property to plaintiff at a profit, the only alternative is to render judgment in favor of Holloway and Beasley.

I do not reach the question of exemplary damages.

GREENHILL and HAMILTON, JJ., join in this opinion.